PAUL ALSTON                           1126
NICKOLAS A. KACPROWSKI    8627
WENDY F. HANAKAHI            7963

DENTONS US LLP
1001 Bishop Street, Suite 1800
Honolulu, Hawai`i  96813-3689
Telephone:  (808) 524-1800
Facsimile:  (808) 524-4591
E-Mail:        paul.alston@dentons.com
                     nick.kacprowski@dentons.com
                     wendy.hanakahi@dentons.com

Attorneys for Plaintiffs
ELIZABETH A. KANE, AIR LINE PILOTS
ASSOCIATION, INTERNATIONAL, and HAWAII
TEAMSTERS AND ALLIED WORKERS, LOCAL 996


SIMON KLEVANSKY                      3217-0

KLEVANSKY PIPER, LLP
A Limited Liability Law Partnership
841 Bishop Street, Suite 1707
Honolulu, Hawai`i  96813
Telephone:  (808) 536-0200
Facsimile:  (808) 237-5757
E-Mail:        sklevansky@kplawhawaii.com

Attorney for Plaintiff
ELIZABETH A KANE


THOMAS N. CIANTRA (Admitted *Pro Hac Vice*)

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
535 Herndon Parkway
Herndon, Virginia  20170
Telephone:  (703)481-2468
E-Mail:        thomas.ciantra@alpa.org

Attorney for Plaintiff
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

10713004-1 | 112969517v-5

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| In re | Case No. 17-01078 (Chapter 7) |
| HAWAII ISLAND AIR, INC., | |
| Debtor. | |
| | |
| ELIZABETH A. KANE, Bankruptcy Trustee; AIR LINE PILOTS ASSOCIATION, INTERNATIONAL; and HAWAII TEAMSTERS AND ALLIED WORKERS, LOCAL 996; | Adversary Proceeding No. _____ **COMPLAINT; DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| PACAP AVIATION FINANCE, LLC; PACAP MANAGEMENT HOLDINGS LLC; PACIFICAP INVESTMENT MANAGEMENT, LLC; MALAMA INVESTMENTS, LLC; SNOWBIZ VENTURES, LLC; PACAP MANAGEMENT SOLUTIONS, LLC; PACAP ADVISORS, LLC; JEFFREY AU; JACK CHUCK SHE TSUI TRUST, also known as the Jack Cheuk She Tsui Revocable Living Trust; JACK TSUI; LAWRENCE INVESTMENTS, LLC; LAWRENCE J. ELLISON REVOCABLE TRUST; OHANA AIRLINE HOLDINGS, LLC; CARBONVIEW LIMITED, LLC; PAUL MARINELLI; LAWRENCE J. ELLISON; CATHERINE YANNONE, | |

U.S. Bankruptcy Court - Hawaii  #19-90027  Dkt # 1  Filed  08/12/19  Page 2 of 108

also known as Kitty Lagareta; and
CHRISTOPHER GOSSERT,

                    Defendants.

# COMPLAINT

Plaintiffs Elizabeth A. Kane, Air Line Pilots Association, International ("ALPA"), and Hawaii Teamsters and Allied Workers, Local 996 ("Teamsters"), by and through their attorneys of record, hereby file their Complaint against the above-named Defendants, allege and aver as follows:

## PARTIES

1.     Plaintiff Elizabeth Kane, at times herein relevant, was and is the duly appointed Chapter 7 trustee (the "Trustee") in the case *In re Hawaii Island Air, Inc.*, Case No. 17-01078, commenced by Debtor Hawaii Island Air, Inc. (the "Debtor" or "Island Air").

2.     Plaintiff ALPA is an unincorporated association organized for the purpose and objectives of a labor organization.  ALPA represents airline pilots at carriers throughout the United States and Canada.  ALPA represents the pilots employed at Island Air on the last day of operations, November 10, 2017, for purposes of collective bargaining.  ALPA represents its members who have designated or will designate ALPA as their representative to maintain this action on their behalf under the Dislocated Workers Act, Hawai`i Revised Statutes ("HRS") chapter 394B.

3.     Plaintiff Teamsters (ALPA and the Teamsters collectively the "Unions") is an unincorporated association organized for the purpose and

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 4 of 108

objectives of a labor organization. Teamsters represents Hawai`i employees across a wide range of industries. Many Island Air employees who were employed at Island Air on the last day of operations, November 10, 2017, were members of Teamsters. Teamsters represents its members who have designated or will designate Teamsters as their representative to maintain an action on their behalf under the Dislocated Workers Act, HRS chapter 394B.

4. Island Air was incorporated in the state of Delaware originally under the name of Aloha Island Air, Inc. on November 25, 1996. Island Air was restored, renewed, and revived under the name of Hawaii Island Air, Inc., in the state of Delaware on April 5, 2007.

5. Defendant PaCap Aviation Finance, LLC ("PaCap Aviation") is a Hawai`i limited liability company. Starting in February 2016, PaCap Aviation held a one-third interest in Island Air. PaCap Aviation's members are Defendants Jack Chuck She Tsui Trust, also known as the Jack Cheuk She Tsui Revocable Living Trust, and Defendant PaCap Management Holdings LLC ("PaCap Management Holdings"). PaCap Aviation's manager is Defendant PacifiCap Investment Management, LLC ("PacifiCap Investment").

6. Defendant PaCap Management Holdings is a Hawai`i limited liability company. PaCap Management Holdings' manager is Jeffrey Au.

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 5 of 108

7. Defendant PacifiCap Investment is a Hawai`i limited liability company. PacifiCap Investment's manager is Mr. Au.

8. Defendant Malama Investments, LLC ("Malama") is a Hawai`i limited liability company. Starting in February 2016, Malama held a one-third interest in Island Air. Malama's members are Snowbiz Ventures, LLC ("Snowbiz") and PaCap Management Holdings, LLC. Malama's manager is PaCap Management Solutions, LLC ("PaCap Management Solutions").

9. Defendant Snowbiz is a Hawai`i limited liability company. Snowbiz's manager is PaCap Management Solutions.

10. Defendant PaCap Management Solutions is a Hawai`i limited liability company. PaCap Management Solutions' managers are Mr. Au and PaCap Advisors, LLC ("PaCap Advisors").

11. Defendant PaCap Advisors is a Hawai`i limited liability company. PaCap Advisors' manager is Mr. Au.

12. Defendant Jeffrey Au is and at all relevant times was a resident of the state of Hawai`i. At all relevant times, Mr. Au was the manager of PacifiCap Investment and PaCap Advisors and the ultimate manager of PaCap Management Solutions. He was also the ultimate manager of both PaCap Aviation and Malama (PaCap Aviation and Malama collectively the "PaCap Entities") (Au, Tsui Trust, Tsui, the PaCap Entities, PaCap Management Holdings, PacifiCap Investment,

Snowbiz, PaCap Management Solutions, and PaCap Advisors collectively the "Au Group").

13.     Defendant Jack Chuck She Tsui Trust ("Tsui Trust"), also known as the Jack Cheuk She Tsui Revocable Living Trust, is a trust containing assets of Jack Tsui.  The Tsui Trust contributed $2 million to PaCap Aviation to fund PaCap Aviation's and Malama's collective purchase of a two-thirds interest in Island Air.

14.     Defendant Jack Tsui is and at all relevant times was a resident of the state of Hawai`i.  Upon information and belief, Mr. Tsui is the settlor, trustee, and beneficiary of the Tsui Trust.

15.     Defendant Ohana Airline Holdings, LLC ("Ohana") is a Hawai`i limited liability company.  Ohana purchased Island Air in 2013 and was the sole shareholder until it sold a two-thirds controlling interest to Mr. Au's entities, PaCap Aviation and Malama, in February 2016.  Ohana retained its one-third interest in Island Air for the remainder of Island Air's operations.

16.     Defendant Carbonview Limited, LLC ("Carbonview") is a Delaware limited liability company.  Carbonview is a Lawrence Investments, LLC ("Lawrence Investments") entity that made loans to Island Air and other companies that Lawrence Investments owns, and also holds other property.

17.     Defendant Lawrence Investments is a California limited liability company.  Lawrence Investments is a private equity investment firm owned by the

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 7 of 108

Lawrence J. Ellison Revocable Trust. Lawrence J. Ellison, also known as Larry Ellison, is the seventh wealthiest person in the world and founder of the software firm Oracle. Lawrence Investments is the beneficial owner of Ohana and Carbonview.

18.     Defendant Lawrence J. Ellison Revocable Trust ("Ellison Trust") is a trust containing the personal assets of Mr. Ellison. The Ellison Trust is the owner of Lawrence Investments. Upon information and belief, Mr. Ellison is the settlor, a trustee, and the beneficiary of the Ellison Trust. Upon information and belief, the Ellison Trust has two trustees: Mr. Ellison and Mr. Marinelli.

19.     Defendant Paul Marinelli is and at all relevant times was a resident of the state of California. At all relevant times, Mr. Marinelli was Lawrence Investments' President, Ohana's manager, Carbonview's President, and a trustee of the Ellison Trust. As Lawrence Investments' President, Mr. Marinelli managed most of the personal financial investments of Mr. Ellison.

20.     Defendant Lawrence J. Ellison is and at all relevant times was a resident of the state of California. Upon information and belief, Mr. Ellison is the settlor, a trustee, and the beneficiary of the Ellison Trust, which owns Lawrence Investments.

21.     Defendant Catherine Yannone, also known as Kitty Lagareta, is and at all relevant times was a resident of the state of Hawai`i. Ms. Yannone was a

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 8 of 108

director of Island Air during the last two months prior to the company's shutdown.

22.     Defendant Christopher Gossert is and at all relevant times was a resident of the state of Hawai`i.  Mr. Gossert was Island Air's Vice President of Finance from May 2017 until shutdown and was a director of Island Air during the last two months prior to the company's shutdown.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

24.     Having demanded a jury trial, Plaintiffs do not consent to this Court trying the case, as Plaintiffs request trial before a Court authorized to conduct jury trials.

25.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

**A.     Factual Overview**

**1.     Introduction**

26.     The Island Air bankruptcy was caused by the self-interested acts of its owners.  Had Island Air's owners and their representatives acted in the interests of Island Air rather than their own, then the bankruptcy of the company would not have occurred when it did (if it occurred at all), the outstanding debts would not have been as substantial as they are, and there would be additional assets to satisfy those debts.

27.     In early 2016, Mr. Ellison's company Ohana sold a two-thirds interest in Island Air to investment entities owned by Mr. Au and his investors. Nonetheless, through his representative Mr. Marinelli, Mr. Ellison continued to exercise substantial control over Island Air up until the bankruptcy. In other words, from early 2016 through the bankruptcy, there were two owners of Island Air:

(1) Mr. Au and his entities that controlled two-thirds of the equity; and

(2) Mr. Ellison and Ohana (acting through Mr. Marinelli) who controlled one-third of the equity but still had substantial control over Island Air.

28.     In May 2017, Island Air hit a substantial financial crisis. By June it became apparent to Mr. Au and Mr. Marinelli that a substantial new investment was necessary to keep Island Air aloft. From May 2017 until the shutdown on November 10, 2017, Island Air was kept on life support through various small cash infusions that all parties knew were insufficient in the long run. As a foreseeable consequence, Island Air's debt ballooned and its assets dwindled. Simply put, any person controlling the company and acting in the best interest of it would have shut it down many months earlier and not continue to dispose of assets and rack up liabilities that could not be repaid.

29.     In the course of this six-month crisis period, the owners of Island Air acted with an astounding disregard for the interests of the company. Mr. Marinelli, as proxy for Mr. Ellison, had an interest in keeping Island Air unnaturally on life

U.S. Bankruptcy Court - Hawaii  #19-90027  Dkt # 1  Filed  08/12/19  Page 10 of 108

support because Island Air was in possession of five aircraft that Mr. Ellison owned. Mr. Marinelli knew that if Island Air went into bankruptcy, it would be extremely difficult to sell Mr. Ellison's five airplanes without the assistance of Island Air's maintenance personnel, and that the price that could be obtained would plummet. So Mr. Marinelli made just enough funds available to Island Air to keep it alive long enough for him to sell those aircraft. Even those funds were given reluctantly and in situations where: (1) the ultimate purchaser of Mr. Ellison's aircraft required some of the purchase funds be made available to Island Air; or (2) where loans were made on terms that Mr. Marinelli thought were very low risk for Mr. Ellison. When the goal of selling Mr. Ellison's aircraft was accomplished, not only did the flow of funds from Mr. Ellison stop, the flow was reversed. ***Mr. Marinelli used his control over Island Air to take critical monies <u>back</u> from the company, just days before the bankruptcy filing***.

30. As for Mr. Au, he believed (falsely) that his investment in Island Air would be completely repaid in bankruptcy because he had structured it as purported debt rather than equity. This was done precisely because Mr. Au (and Mr. Marinelli) knew that Mr. Au was making a small and very risky investment, and Mr. Au wanted the investment to be protected in the event of a bankruptcy. Island Air was never profitable from the time Mr. Au got involved, and the cash crisis became acute in May 2017 when the company exhausted its line of credit

from Mr. Ellison.  Although Mr. Au knew that a substantial outside investment was needed, he categorically refused to consider any investment that would either: (1) convert his prior investment from debt to equity, and therefore deprive his investment of the protection in bankruptcy that he thought it had by structuring it as debt; or (2) substantially dilute his two-thirds equity ownership of Island Air and cause him to lose control and the upside potential on his equity.  Rather, Mr. Au continued to look for a sweetheart deal for a new investment, proposing only the most patently unrealistic of terms and juicing up the Island Air financial projections provided to potential investors to try to lure one in.  From Mr. Au's perspective, he had little to lose (because he thought his initial investment was protected) and much to gain by risking Island Air's future in the hopes of a sweetheart deal for a new investment.

31.     Other than the unsecured creditors of Island Air in general, the real victims of Mr. Au's and Mr. Marinelli's disloyalty were Island Air's employees. When the company filed for Chapter 11 bankruptcy on October 16, 2017, the employees were told that there was nothing to worry about and the future was bright.  As a result, when the company shut down less than a month later, the employees were shocked.  Responsible parties did not give Island Air employees or their unions the required 60 days' notice of closure under the state Dislocated Workers Act or the federal Workers Adjustment and Retraining Notification Act,

29 U.S.C. §§ 2101-2109 (the "WARN Act") (the Dislocated Workers Act and the WARN Act collectively the "WARN Statutes"). They were not paid their wages from the last pay period. Their medical premiums were not paid. Rather than use the available funds of Island Air to pay the employees, Mr. Au tried to secure those funds for himself.

### 2. Mr. Tsui and Mr. Au Purchased a Controlling Interest in Island Air in February 2016

#### a) Mr. Ellison's Company Owned Island Air and Sold a Controlling Interest to Mr. Tsui and Mr. Au

32.    Island Air was a commercial entity and an airline with inter-island routes in Hawai`i, including service to Lana`i from Honolulu. In 2012, Mr. Ellison bought (through entities he owns and controls) 98% of the land on the island of Lana`i for a reported $300 million. In 2013, Mr. Ellison's company Ohana purchased a 100% ownership interest in Island Air. Ohana purchased Island Air from Gavarnie Holding, LLC and became the sole shareholder of Island Air. Mr. Marinelli represented Mr. Ellison's interests in any matter relating to Island Air.

33.    Upon information and belief, in 2015, Mr. Ellison decided to sell a controlling interest in Island Air. Mr. Marinelli represented Mr. Ellison's interest in negotiating a sale.

34.     Mr. Au was the founder and managing director of a Hawai`i-based investment group known in shorthand as PacifiCap.  PacifiCap is a group of funds and entities that makes private equity investments, primarily in Hawai`i.  Through PacifiCap entities controlled by Mr. Au and PacifiCap, PacifiCap purchased a controlling interest in Island Air.  Mr. Tsui provided $2 million to PacifiCap and Mr. Au for the transaction.

35.     The transaction was financed almost entirely by the parties' purported debt investment rather than stated equity investment.  The PaCap Entities each bought one-third of the shares for $4,000, a total of $8,000 for a two-thirds controlling interest.  PaCap Aviation made a $2 million purported senior secured loan to Island Air.  Mr. Ellison's entity Ohana bought one-third of the shares for $4,000.  Mr. Ellison used another company, Carbonview, to contribute to Island Air $2 million in a purported senior secured loan, $3 million in new money in a subordinated unsecured loan,[1] and $3.5 million in a line of credit intended for aircraft lease rent and/or maintenance reserve payments.  By structuring the transaction with purported senior secured loans, Mr. Au and Mr. Marinelli intentionally placed PaCap Aviation and Carbonview above other creditors, including approximately 400 employees and customers.  The purchase and

---

[1] Carbonview contributed $6 million, and $3 million of those proceeds were then used by Island Air to pay off existing debt to Carbonview.

10113004-1 | 112969517\V-5

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 14 of 108

refinancing transaction closed on February 4, 2016, with $7 million in new money flowing into Island Air immediately as part of the transaction, with a remaining $3.5 million available on a line of credit.

36. The 2016 transaction purposefully left Island Air undercapitalized. There was no reasonable scenario in which $7 million would be sufficient to sustain operations given any reasonably likely projections for revenue. Island Air had never been profitable while Ohana solely owned Island Air from 2013 to 2016. During that time, Mr. Ellison's companies provided approximately $50 to $75 million to Island Air. At the time of the February 2016 transactions, Mr. Au and Mr. Marinelli knew that the monies invested were not sufficient capital for Island Air, *i.e.*, the company was undercapitalized. They knew that without additional funds there was a high risk that the airline would fail. Mr. Au, however, was willing to invest because he believed that his $2 million was protected in bankruptcy, and because $8,000 in equity (even coupled with a $2 million loan) is such an obviously small investment for two-thirds equity in an airline that if the company **did** succeed, there would be a huge return on investment.

**b) Mr. Tsui and Mr. Au Put Together a Team to Run Island Air**

37. Mr. Tsui and Mr. Au put together a team to run Island Air.

38. Mr. Tsui asked Les Murashige to be Island Air's Chief Executive Officer ("CEO"). Mr. Murashige had over thirty years in the airline industry,

10113004-1 | 112969517\V-5

U.S. Bankruptcy Court - Hawaii  #19-90027   Dkt # 1   Filed  08/12/19   Page 15 of 108

including six years in executive positions with Island Air.  At separate times, he had been Island Air's Chief Operating Officer ("COO") and President.

39.     Mr. Murashige, in turn, asked Robert Mauracher to be Island Air's COO.  Like Mr. Murashige, Mr. Mauracher had significant experience in the airline industry, including previously being Island Air's CEO while Mr. Murashige was the COO.

40.     Glenn Taniguchi was brought in as an advisor.  Mr. Taniguchi had nearly 40 years in the aviation industry.  He had worked for Hawaiian Airlines from 1985 to 2014 and held various senior level positions: Director of Schedule Planning and Reservations, Vice President of Schedule Planning, and Senior Vice President of Marketing and Sales.  Mr. Taniguchi's involvement was intended to be confidential so as not to cause issues with Hawaiian Airlines.

41.     David Uchiyama would be the Chief Commercial Officer.  He interviewed with Mr. Au.  Mr. Uchiyama built his career in the visitor industry.  He had very little experience in the airline industry other than working for a few years at Continental Airlines in the late 1970s during college and then for a few years in the early 1980s in entry- and mid-level positions at Mid-Pacific Air.

42.     On February 8, 2016, Island Air's shareholders elected three directors.  On behalf of Ohana, which had the right to name one director, Mr. Marinelli elected himself as a director.  Given the structure of the Island Air ownership,

Mr. Au through his control of PacifiCap and related entities, had the ability to select two of the three Island Air directors.  On behalf of the PaCap Entities, Mr. Au elected Mr. Murashige and Mr. Uchiyama as directors.  Mr. Au could have elected himself as a director, but he chose not to.  That same day, the three directors elected Island Air's new officers: Mr. Murashige as President, Mr. Mauracher as COO, and Mr. Uchiyama as the Chief Commercial Officer, Chairman, Secretary, and Treasurer.

### 3. The Control Group Led By Mr. Au Controlled the Company

43.     Mr. Au was part of a control group where he exercised primary control.  This control group included Mr. Au, Mr. Tsui, the entities Mr. Au managed directly and indirectly, Mr. Marinelli, Ohana, Lawrence Investments, and the various directors of Island Air (the "Control Group").  Mr. Au controlled Island Air's directors.  As the majority shareholder, he had the ability to appoint and remove two of the three directors at his pleasure.  He even had influence over Ohana's selection of a director and thus control over that director as well.  Mr. Au had all authority delegated to him by the other members of the Control Group, with the exception of Mr. Marinelli's actions toward selling Island Leasing, LLC's ("Island Leasing") ATR aircraft.[2]

---

[2] Island Leasing is a company owned by Mr. Ellison that owned five ATR aircraft that it leased to Island Air for its operations.  Mr. Marinelli is the President and manager of Island Leasing.

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 17 of 108

44.     Soon after the new management team came in, Mr. Au became actively involved in Island Air's operations even though he had no airline experience. He became involved in and started exercising increasing control over day-to-day operations on behalf of the Au Group and with the consent of everyone in the Control Group, which hindered Mr. Murashige, Mr. Mauracher, and the team from doing their work during the transition. Mr. Murashige and Mr. Mauracher challenged Mr. Au over his interference in operations. In response, Mr. Au terminated both men on April 22, 2016.

45.     Mr. Au gave himself a title that he carefully crafted to give himself influence and authority with people he dealt with on behalf of Island Air but at the same time to attempt to insulate himself from fiduciary duties and liability. He designated himself the "Managing Director, Chairman and a member of the Executive Committee." He could have elected himself a director, the way Mr. Marinelli had elected himself as a director. Instead, he intentionally chose to not be a director or an officer.

46.     After Mr. Au terminated Mr. Murashige and Mr. Mauracher, there was no one at Island Air who had executive level airline experience. Rather than hire someone with airline experience to be CEO, Mr. Au promoted Mr. Uchiyama to President and CEO and left the COO position vacant. Mr. Uchiyama is an amiable and conciliatory person, and his primary qualification for CEO in

U.S. Bankruptcy Court - Hawaii  #19-90027   Dkt # 1   Filed  08/12/19   Page 18 of 108

Mr. Au's assessment was that he would not challenge Mr. Au's authority, as Mr. Murashige and Mr. Mauracher had.

47.     Mr. Murashige's director position was left vacant until November 2016, when Mr. Au elected James Donovan as a director.  Mr. Donovan is the University of Hawai`i's former Athletic Director and did not have any experience as either an employee or executive of an airline.

### 4.     Island Air Transitioned From ATR Aircraft to Q400 Aircraft

48.     In 2016, Island Air began a process of transitioning their fleet of aircraft from their five old ATR aircraft, which Island Air leased from Island Leasing, to a different type aircraft, the Bombardier Q400.  On behalf of Island Air, Mr. Au negotiated the Q400 leases with aircraft lessors Elix Aviation Capital Limited ("Elix")[3] and Nordic Aviation Capital ("NAC").  Island Air leased three Q400s from Elix and two Q400s from NAC.

49.     By June 2017, Island Air had completed its transition from five ATR aircraft to five Q400 aircraft.  As a result of the transition, Island Leasing's five ATR aircraft were gradually taken out of service, and eventually no longer used. In a June 2, 2017 email to Mr. Ellison, Mr. Marinelli commented on the need to

---

[3] Island Air leased the Q400 aircraft from Wells Fargo Bank Northwest, National Association ("Wells Fargo"), the owner trustee of the aircraft.  Elix was the beneficial owner of the aircraft, and the entity with whom Island Air negotiated the lease agreement.

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 19 of 108

sell the five ATR aircraft since Island Air had completed its transition to a Q400 fleet.

**5.    Island Air's Financial Crisis Started in May 2017**

50.    From May 2017 through September 2017, Island Air was in increasingly dire financial straits punctuated by acute cash shortfalls that threatened to force Island Air to shut down.

a.    On May 4, 2017, Christopher Gossert, Island Air's Vice President of Finance, discovered that Island Air was facing a $700,000 deficit the following week.  Mr. Marinelli agreed that Carbonview would permit a draw from the line of credit in the amount of $850,000, which Island Air received on May 17, 2017.

b.    In early June 2017, Island Air again faced a cash shortfall and would not have enough funds to cover its employees' payroll.  Mr. Ellison was not willing to provide any additional loans at that time.  In order to cover the $450,000 shortfall, Mr. Au, Mr. Marinelli, Mr. Uchiyama, and one of Mr. Au's entities raised the funds among themselves.  As described below, the loans by Mr. Au, Mr. Marinelli, and Mr. Au's entity were motivated by factors other than generosity and altruism.

c.    Island Air again faced a cash shortfall for the second payroll in June 2017.  To cover this shortfall, Mr. Marinelli agreed that Island Leasing would

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed   08/12/19   Page 20 of 108

loan Island Air $800,000 and take a security interest in Island Air's ATR spare parts.  Mr. Donovan had concerns about this transaction and resigned.  Island Leasing paid Island Air $800,000 on June 21, 2017.

      d.     Island Air faced another payroll crisis in early July 2017. This time, the company did not secure any funding.  On July 7, 2017, the payroll transaction was processed with an $840,000 overdraft.

      e.     In early August 2017, Island Air faced another payroll crisis. At the time Island Leasing had been negotiating to sell the ATR aircraft that Island Air had taken out of service.  Mr. Marinelli agreed that Island Leasing would sell its ATR aircraft to Elix for $5.5 million, with Island Leasing taking $3.5 million and $2 million going back to Island Air.  Elix paid a $500,000 down payment to Island Leasing on August 4, 2017, when the parties executed a Letter of Intent. Mr. Marinelli agreed to give Island Air the $500,000 down payment from Elix as a maintenance fee for maintaining the ATRs.

      f.     In mid-August 2017, Island Air also received $400,000 from AAR Supply Chain Inc. ("AAR").  AAR had agreed to purchase for $1.2 million Island Air's ATR spare parts (the spare parts that Island Leasing had taken a security interest in when it loaned Island Air $800,000) and some of Island Air's other ATR inventory.

g. By early September, vendors had started to freeze Island Air's accounts for nonpayment. On September 15, 2017, Carbonview paid Island Air $888,000 as part of the $1.5 million owing to it from Elix's purchase of Island Leasing's ATR aircraft.

51. In the five months leading up to the bankruptcy, Island Air was losing money hand over fist. Any reasonable person controlling the airline would have entered bankruptcy much earlier.

52. Island Air was kept on life support for five months by cash infusions primarily controlled by Mr. Ellison. But after Mr. Ellison realized his goal of selling his five aircraft to Elix, Mr. Marinelli not only cut off the flow of funds, he used his control over Island Air to take funds back. On October 13, 2017, when the bankruptcy filing was imminent, Mr. Marinelli used his control over Island Air to secure a $400,000 wire from Island Air to Island Leasing. This was at a time when Island Air's financial situation could not have been worse. If Island Air had not transferred the funds, it could have used it to pay other creditors that were supplying goods or services necessary for operations, which Island Leasing was not. Island Leasing and Mr. Marinelli would have had virtually no recourse other than those available to all the other Island Air creditors. Indeed, at the time, the Island Air survival plan was to try to use all available funds to keep the company alive in the unrealistic hopes of finding an investor willing to pay a large amount

for a minority equity interest. But instead of using the $400,000 to further that goal or to pay other creditors (including employees owed wages and salaries), Island Air succumbed to Mr. Marinelli's pressure to pay Island Leasing and transferred the funds for the benefit of the seventh richest man in the world.

### 6. Problems with Aircraft Lessors Started in August 2017

53.     In August 2017, Island Air received default notices from both of its Q400 lessors, Elix and NAC. NAC was not willing to work out a deal with Island Air and grounded its two Q400s on September 12, 2017. Island Air was thus forced to conduct its operations with three aircraft instead of two. Losing two aircraft further worsened Island's Air financial situation.

54.     Elix was willing to work out a deferral agreement with Island Air. The parties reached an agreement and executed their Lease Payment Deferral and Amendment Agreement on September 15, 2017.

55.     Despite working out this deferral agreement with Elix, Island Air was unable to make its first rent payment due in October, and Elix issued a notice of termination on October 12, 2017.

### 7. Island Air Filed for Chapter 11 Bankruptcy in October 2017 and Then Shut Down in November

56.     In response to Elix's notice of termination, Island Air filed for Chapter 11 bankruptcy on October 16, 2017.

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 23 of 108

57.     The Chapter 11 filing afforded Island Air certain protections from creditors, but it did not change Island Air's need for cash.  Island Air had survived from May to September 2017 by receiving nearly $4 million in cash infusions from Mr. Ellison's entities and other insiders.  Those infusions were primarily motivated by the self-interest of these insiders.  Island Air continued to lose money, and its only chance for survival was significant outside investments.

58.     The Control Group knew it was critical that Island Air receive a significant outside investment, and the urgency of doing so was mounting rapidly. Island Air needed to pay the premiums on the various insurance policies required for flying its aircraft.  On November 1, 2017, Island Air received its first Notice of Cancellation of an insurance policy due to nonpayment.  The Notice of Cancellation had a 30-day notice period within which Island Air could cure its nonpayment. Island Air's insurance broker advised that Island Air faced an imminent cascade of Notices of Cancellation and that the only way to cure the cancellation was to pay the approximately $476,000 insurance bill.  At that time, Island Air was already facing an approximately $400,000 shortfall to fund its upcoming payroll.  To make matters worse, on November 2, 2017, Island Air received a 10-day Notice of Cancellation for another insurance policy.

59.     Throughout the entire time period from June 2017 to the shutdown of Island Air, both the Au Group and Island Air had been pursuing a large outside

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 24 of 108

investor. But Mr. Au refused to accept a transaction that would require him to convert his investors' $2 million debt into equity. This is because he believed doing so would cause him to lose the protections for that purported debt investment that he thought he had in bankruptcy. He also refused any investment that would dilute his equity and cause him to lose controlling interest in the airline. As a result, he proposed only the most unrealistic investments that he knew would be unlikely to succeed.

60. With no outside investments and the insurance cancellation pending, Island Air had no ability to bring its insurance accounts current in order to continue flying its aircraft with the necessary insurance coverage. On November 8, 2017, Mr. Au, Mr. Uchiyama, and Mr. Gossert made the decision to convert Island Air's Chapter 11 bankruptcy to Chapter 7, which would mean a liquidation of the airline.

61. On November 9, 2017, Mr. Uchiyama sent a mass email to the Island Air employees, informing them that the next day (November 10) would be the last day of Island Air's operations.

62. On November 10, 2017, Island Air permanently shut down all of its operations. On that date, Island Air had approximately 400 employees.

63. Under the control of Mr. Au and other defendants, Island Air failed to meet the requirements of the WARN Statutes:

a. Island Air did not provide employees with 60 days' notice of the shutdown, as required by section 394B-9(a) of the Dislocated Workers Act;

b. Island Air did not provide 60 days' notice of the closing to each representative of affected employees, or if there is no such representative, to each affected employee, as required by § 2102(a) of the WARN Act.

c. Island Air did not pay on November 10, 2017, to each employee all wages, benefits, and other forms of compensation due and owing to said employee, as required by section 394B-11 of the Dislocated Workers Act; and

d. Island Air did not provide written notification of the closing to the Director of the Department of Labor and Industrial Relations, as required by section 394B-9(a) of the Dislocated Workers Act.

64. On November 12, 2017, Island Air filed its motion to convert the case to a Chapter 7 proceeding. On November 15, 2017, the case was converted to a Chapter 7 proceeding, and the Trustee was duly appointed as the bankruptcy trustee of the estate.

**B. Mr. Au's Control Group Controlled Island Air**

**1. Mr. Tsui was the Controlling Shareholder and Mr. Au was His Representative**

65. Mr. Tsui and Mr. Au did not have any experience in the airline industry when they decided to purchase a controlling interest in Island Air.

U.S. Bankruptcy Court - Hawaii #19-90027 Dkt # 1 Filed 08/12/19 Page 26 of 108

a.     Prior to the transaction, Mr. Au had never worked at an airline or done any work in an advisory or consulting role for an airline.  He was the principal of an investment firm called PacifiCap, and none of the investment funds that he had been involved with throughout his career had any investments in airlines.  Mr. Au's involvement with Island Air was his first experience in the airline industry.

b.     Mr. Tsui was a founder and CEO of Panda Travel.  He formed Panda Travel with his sister Lydia Tsui in 1980.  He had nearly four decades of experience in the travel industry.  Mr. Tsui did not have any experience in the airline industry.

66.     Mr. Au set up the PaCap Entities as entities that would purchase a two-thirds interest in Island Air.

a.     PaCap Aviation was formed to hold a one-third ownership interest in Island Air and to make a loan to Island Air.

b.     Mr. Au stated that he intended Island Air's management team to receive equity in Malama.  No member of Island Air's management team ever received equity in Malama.  As a result, Mr. Au himself owned a third of Island Air through his ownership of Malama.

c.     Mr. Au was the sole manager for PaCap Aviation's and Malama's sole managers.

d.     Mr. Au has acknowledged that PacifiCap has a controlling interest in Island Air.

67.     The Tsui Trust contributed $2 million to PaCap Aviation for the purchase, and PaCap Management Holdings, LLC contributed $5,000 to PaCap Aviation.  The members' ownership interests in PaCap Aviation were proportional to their contributions.  Thus, the Tsui Trust owned approximately 99.8% of PaCap Aviation. Mr. Au would consult with Mr. Tsui when making certain decisions for PaCap Aviation.

68.     On the seller's side of the transaction, the parties included Ohana, as the sole shareholder of Island Air, and Carbonview.  Carbonview is a Lawrence Investments entity that made loans to Island Air and other companies that Lawrence Investments owns, and also holds other property.

69.     As part of the Island Air purchase transaction, Island Air issued warrants to Ohana to purchase an additional 600,000 shares of common stock of Island Air (the "Stock Warrant").

70.     The purchase transaction had two closing dates: December 20, 2015, and February 4, 2016. The transaction was completed on February 4, 2016.

71.     Mr. Marinelli believed that the Mr. Tsui and Mr. Au group were in control.  Specifically, Mr. Marinelli considered Mr. Tsui to be the majority

shareholder of Island Air and Mr. Au to be Mr. Tsui's representative.

Mr. Uchiyama also believed that Mr. Au represented the controlling shareholders.

**2.  Mr. Au Would Not Tolerate Executives Who Disagreed With Him and Surrounded Himself With People Lacking Airline Experience Whom He Could Dominate**

72.  After he removed Mr. Murashige and Mr. Mauracher, Mr. Au selected people without airline experience to hold the positions with the most responsibility and influence in the company.

### a)  President and CEO David Uchiyama

73.  The April 22, 2016 Unanimous Written Consent that Mr. Au drafted elected Mr. Uchiyama as the Acting President and CEO to replace Mr. Murashige on an interim basis.  No one was elected to the COO position to replace Mr. Mauracher.  While he was the Acting President and CEO, Mr. Uchiyama told Mr. Au and Mr. Marinelli that he wanted to be the permanent President and CEO. Mr. Au told him that he would be given the permanent position.  On June 1, 2016, by Unanimous Written Consent drafted by Mr. Au, Mr. Uchiyama was elected President and CEO.

74.  Mr. Uchiyama's background was in the visitor industry. In the nearly twenty years prior to Island Air, Mr. Uchiyama's professional career entailed: (1) Regional Director of Communications at Starwood Hotels & Resorts in Hawai`i and French Polynesia from 1996 to 2007; (2) Vice President of Brand

Management at the Hawai`i Tourism Authority ("HTA") from 2007, with Mr. Uchiyama leaving HTA in August 2015 when a new COO started; and (3) Vice President of Sales and Marketing at Hawaii Gas from October 2015 to January 2016.

75.     Mr. Uchiyama did not have any experience as a CEO or a COO of a for-profit company, and he had very limited experience in the airline industry. Mr. Uchiyama only had a few years of customer service and sales experience with airlines at the very beginning of his career: (1) Customer Service Agent for Continental Airlines from 1977 to 1981, working while he also attended classes at the University of Hawai`i at Manoa until 1980; (2) Visitor Sales Representative for Mid-Pacific Air in Honolulu, Hawai`i, from 1981 to 1982; and (3) Regional Sales Manager for Mid-Pacific Air in Los Angeles, California, from 1982 to 1983.

76.     Mr. Uchiyama understood early on that Mr. Au was the investors' representative and was in control.  Mr. Uchiyama once confronted Mr. Murashige, then CEO, about an argument that Mr. Murashige had with Mr. Au, where Mr. Murashige thought he should be making a particular decision.  Mr. Uchiyama felt that Mr. Murashige should have been more respectful of Mr. Au's position as the investors' representative.  In other words, Mr. Uchiyama felt so strongly about Mr. Au's position and control at Island Air that he challenged the CEO about trying to assert autonomy with Mr. Au.

77.     Mr. Uchiyama would not stand in the way of the Au Group's control of Island Air.  He saw what happened when Mr. Murashige and Mr. Mauracher challenged Mr. Au in the first few months after the transaction.  He later saw that Mr. Au readily accepted Mr. Donovan's resignation when Mr. Donovan objected to the spare parts transaction that Mr. Au desperately wanted to approve on June 20, 2017, which was the first and only time that Mr. Donavan, a director, tried to challenge Mr. Au.  Unlike his predecessor CEO who was terminated, Mr. Uchiyama did not try to restrict Mr. Au.  Being Island Air's CEO was a great opportunity for Mr. Uchiyama, and he did not want to lose it by challenging Mr. Au.

78.     If Mr. Au was unhappy with Mr. Uchiyama about something, he freely spoke to Mr. Uchiyama about it.

79.     When Mr. Uchiyama had a disagreement with Mr. Au related to how Mr. Au conducted himself in the office, Mr. Au ignored him:

     a.     At one point, Mr. Au was making derogatory comments about former employees as he walked around the office.  Mr. Uchiyama asked the Human Resources director to sit in on a meeting with Mr. Au as Mr. Uchiyama asked Mr. Au to stop making derogatory comments about former employees.  As a form of back up, the Human Resources director told Mr. Au that what he was

doing was inappropriate. Mr. Au responded that if what he was saying was the truth, then he had the right to say it.

b. When revenue was not meeting expectations, Mr. Au sent emails to the sales team that Mr. Uchiyama believed took away from the sales team's productivity. In an effort to reduce Mr. Au's distraction of the employees, Mr. Uchiyama asked Mr. Au to direct his inquiries to him (Mr. Uchiyama). Mr. Au ignored Mr. Uchiyama and continued to communicate directly with the employees against Mr. Uchiyama's request.

80. Mr. Uchiyama was the only person on the board of directors after Mr. Donovan resigned on June 20, 2017, and Mr. Marinelli resigned on July 10, 2017. After that, Mr. Au elected Ms. Lagareta and selected Mr. Gossert, who both lacked airline experience and were unlikely to challenge Mr. Au.

### b) Director James Donovan

81. The director position held by Mr. Murashige remained vacant for seven months. Mr. Au identified Mr. Donovan as a potential new director.

82. In approximately mid-October 2016, Mr. Au asked Mr. Donovan if he wanted to serve as a director and invited him to attend a board meeting one week later, on October 21, 2016. Mr. Donovan attended that meeting. Two or three weeks later, Mr. Au asked Mr. Donovan if he wanted to be a director, and

Mr. Donovan said yes.  On November 22, 2016, Mr. Au elected James Donovan as a director.

83.     Mr. Donovan had a successful career in university athletics.  At the time Mr. Au elected him to be a director, Mr. Donovan was the Director of Athletics at California State University, Fullerton, a position he had started in 2012.  Prior to that, Mr. Donovan had a long career with the University of Hawai`i ("UH"). He was the UH Athletics Director from 2008 to 2012.  Mr. Donovan did not have any direct airline experience.

84.     On June 20, 2017, Island Air was facing a payroll crisis and needed an immediate cash infusion or it would have insufficient funds to make its payroll. That day, Mr. Uchiyama called Mr. Donovan to tell him that Mr. Au was going to send Mr. Donovan a document to sign off on the sale of Island Air's ATR spare parts to Island Leasing for $800,000.  Mr. Donovan said that he recalled a board conference call from one or two weeks prior where Mr. Au said that there were two parties who were interested in the spare parts for around $1.2 to $1.5 million. Mr. Donovan did not understand why, just one or two weeks after that board conference call, the company was trying to sell the spare parts to Mr. Marinelli's company for only $800,000.[4]

---

[4] The "sale" of spare parts is the subject of an adversary action.  Mr. Uchiyama testified that as CEO of Island Air, he believed that it was really in the nature of a

10113004-1 / 112969517\V-5

85.     After that first call with Mr. Uchiyama, Mr. Donovan had a second call, this time with both Mr. Au and Mr. Uchiyama.  Mr. Donovan repeated to Mr. Au his concerns about selling the ATR spare parts to Mr. Marinelli's company for $800,000 after there had been two interested parties who were interested in paying between $1.2 and $1.5 million.  Mr. Au responded that they needed the money to make payroll the next day.  Mr. Donovan was still not comfortable and asked if there was any way that they could get the two interested parties to submit bids over the next three to five days.  Mr. Au said that there was no time.  Mr. Au suggested that Mr. Donovan could vote "no" on the transaction.  Mr. Donovan added that he could resign.  Mr. Au said that was fine.  He did not try to advocate his suggestion of Mr. Donovan remaining a director and voting no.  In other words, when Mr. Donovan challenged him on the spare parts transaction, Mr. Au preferred that he resign as a director than remain on the board.  Mr. Donovan submitted his letter of resignation within an hour of the phone call with Mr. Au.

86.     Shortly after the phone call with Mr. Donovan, Mr. Au emailed Mr. Marinelli about finalizing the sale of the spare parts.  He told Mr. Marinelli that Mr. Donovan resigned but did not tell him the real reason.  Mr. Au said that

---

loan.  Mr. Uchiyama also testified that Mr. Donovan understood the nature of the transaction but objected because it would not be appropriate to approve a transaction of parts styled a "sale" for less than they were worth to a company controlled by an Island Air insider.

10113004-1 | 112969517\V-5

Mr. Donovan resigned "since he has not been as involved with the company." This was not true.

### c) Director Kitty Lagareta (Catherine Yannone)

87. With the resignations of Mr. Donovan on June 20, 2017, and Mr. Marinelli on July 10, 2017, the only director was Mr. Uchiyama. On September 14, 2017, Mr. Au elected Ms. Lagareta as a director.

88. Ms. Lagareta worked in public relations. She started working at Communications Pacific, a public relations company, in 1986 as an account executive. With the exception of a brief hiatus from approximately 1995 to 1996, Ms. Lagareta worked at Communications Pacific through 2017, steadily progressing from account executive to CEO. Ms. Lagareta did not have any airline experience.

89. Ms. Lagareta believed that her role as a director was primarily to provide guidance on public relations issues. Thus, she was not likely to challenge Mr. Au on any business or financial decisions.

### d) Director Christopher Gossert

90. Mr. Marinelli's director position was left vacant after he resigned on July 10, 2017. On September 14, 2017, Mr. Marinelli elected Christopher Gossert as a director. Mr. Gossert was 37 years old. Immediately prior to starting at Island Air, Mr. Gossert had spent over twelve years at the accounting firm Ernst & Young

U.S. Bankruptcy Court - Hawaii #19-90027 Dkt # 1 Filed 08/12/19 Page 35 of 108

and was a senior manager in the audit practice there. At Ernst & Young, he had significant experience with accounting, which focuses on the recording and reporting of financial records, but very limited experience with finance, which involves planning the financial transactions for an organization and managing its assets and liabilities. Mr. Gossert was also a certified public accountant. He never held an executive level position at a company. He had never worked in the airline industry.

91.     Mr. Gossert was Ohana's elected director, and thus Mr. Marinelli had the right to appoint him, but Mr. Au selected him. Mr. Au and Mr. Uchiyama (not Mr. Marinelli) asked Mr. Gossert to be a director. They explained to him that three directors were needed to approve the Elix transaction (the deferral agreement regarding Island Air's unpaid rent and maintenance reserve payments) and that it was not a long-term position for him. In other words, Mr. Au selected two additional directors not because he wanted seasoned industry experts as directors looking over his shoulder, but because he needed to fill seats in order to enter into a transaction with Elix. Mr. Au sent Mr. Marinelli the document to sign in order to elect Mr. Gossert as a director.

92.     Mr. Gossert was focused on the company's dire financial situation and was told his temporary position as director was only needed to approve the Elix deferral agreement. By these terms, Mr. Gossert accepted his director position for

the purpose of giving his approval. Mr. Gossert was unlikely to challenge Mr. Au, which was precisely what Mr. Au wanted in a director.

### 3. Mr. Au Gave Himself a Title

93. As part of taking control of Island Air on behalf of the Au Group, Mr. Au empowered himself with a self-created position that gave him the appearance of authority and agency to those outside Island Air. On approximately March 27, 2016, Mr. Au sent an email to the directors (Messrs. Marinelli, Uchiyama, and Murashige) with an attachment for their review and signature. The attachment was the Unanimous Written Consent of the Board of Directors that did the following things:

    a.    Established an Executive Committee;

    b.    Designated Messrs. Murashige, Mauracher, and Uchiyama as members of the Executive Committee; and

    c.    Designated Mr. Au as a "Managing Director, Chairman and a member of the Executive Committee," but carefully noted that Mr. Au "shall be an executive of the Corporation but . . . shall not be, and shall not be deemed to be, a corporate director or corporate officer of, and shall not have agency authority to act on behalf of, the Corporation."

94. Mr. Au's email dated March 27, 2016, further stated that he thought it was important for the Board to formally approve and document the formation of

the Executive Committee before he attended aircraft lease negotiations with an aircraft lessor on March 31 and April 1, 2016, in San Francisco. His email also stated that he had discussed the Executive Committee with Island Air's outside labor counsel, Richard Rand. All three directors signed the Unanimous Written Consent on March 28, 2016.

95. It was Mr. Au's idea to create the "Managing Director, Chairman and a member of the Executive Committee" position for himself. Mr. Marinelli, with his extensive business experience, had never seen such a position before.

96. The reason Mr. Au created the specific position of "Managing Director, Chairman and a member of the Executive Committee" for himself was because he wanted the appearance of authority (and, as an aside, he wanted flight benefits). Be he did not want the title of officer or director. He erroneously viewed the law as providing that even though he exercised ultimate control over Island Air, by not being a director or officer in title, he would not owe the company fiduciary duties.

### 4. Mr. Au Controlled Island Air's Day-to-Day Operations

97. Led by Mr. Au, the Control Group's control over Island Air extended not only to high-level decisions, but to day-to-day operational decisions.

98. In 2016, Island Air's five ATR aircraft were owned by and leased from Island Leasing. The five ATR aircraft were old. Mr. Au took the lead in

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 38 of 108

investigating and analyzing whether Island Air would acquire additional ATR aircraft or Q400 aircraft. In approximately July 2016, it was decided to transition Island Air's fleet from its old ATR aircraft to Q400 aircraft.

99. To further this process, Mr. Au negotiated the leases with the aircraft lessors. On behalf of Island Air, Mr. Au negotiated the leases for three Q400 aircraft from Elix and two Q400 aircraft from NAC. Mr. Au freely communicated with Island Air's attorneys at Holland & Knight to discuss lease negotiations and documents.

100. Mr. Marinelli believed that Mr. Au gave himself an important sounding position for purposes of being able to negotiate the aircraft leases. This strategy appeared to have worked. Island Air's attorney Audrey Sung, who provided counsel to Island Air for the aircraft leases, said in an August 30, 2017 email that "we have been reporting to Jeff Au, and taking his instructions as the Managing Director & Chairman of the Executive Committee of Island Air, because we were operating on the instruction that he was our primary point of contact."

101. In addition to handling the aircraft lease negotiations, Mr. Au, acting on behalf of the Au Group, had primary control over Island Air's day-to-day operations:

     a. Mr. Au had the authority to call meetings with employees and to request the attendance of senior managers who reported to the CEO. In an

August 7, 2017 email to the sales team, Mr. Au called a meeting for August 9th.
He set an agenda for the meeting and instructed people to complete specific
assignments beforehand in preparation.  In the email, Mr. Au told certain
employees to attend the meeting, including Richard Oshiro, the VP of Sales who
reported to Mr. Uchiyama.  In other words, Mr. Au called a meeting of
Mr. Oshiro's team and instructed Mr. Oshiro to also attend.  Moreover, Mr. Au
told Mr. Uchiyama in that same email that he (Mr. Uchiyama) was "welcome to
attend if you want to," making it clear that Mr. Uchiyama need not be there.

>    b.    When Mr. Au identified an issue with incorrect fares one
evening and believed the fares needed to be fixed immediately, he contacted
Mr. Oshiro and a member of his sales team directly by email and phone to have
them fix the fares as soon as possible that night.

>    c.    Mr. Au was involved in scheduling flights.  On June 13, 2017,
Mr. Au wanted to makes some changes to the flight schedule and asked
Mr. Uchiyama to hold up the pilots' schedule, which Island Air was required to
issue within a certain amount of time under ALPA's contract.

102.    Consistent with the Au Group's control over Island Air's operations,
Mr. Au was frequently at the Island Air office.  Mr. Uchiyama estimated that
Mr. Au was at the Island Air office a minimum of two days per week.  Mr. Au

estimated that he spent an average of six to eight hours per day on work related to Island Air.

## C. Mr. Au and Mr. Marinelli Approved an Undercapitalized and Risky Business Plan

103.    Prior to the purchase and refinancing transaction, Mr. Murashige told Mr. Tsui that Island Air would need approximately $15 million to make some of the changes required.  Mr. Murashige was concerned that the amount he was given to start with was not enough.  He told both Mr. Tsui and Mr. Au that he did not believe that Island Air had enough money to make the changes required to make it into a viable operation and that he did not believe that Island Air had enough cash for him to run it.  When he expressed his concerns to Mr. Tsui, Mr. Tsui told Mr. Murashige that he would get more cash as he needed it.

104.    Prior to the transaction, the Au Group prepared a five-year business plan for Island Air with the assistance of Island Air's management team, led by David Pflieger, Island Air's CEO at the time.  Mr. Au's team, including Mr. Murashige, reviewed the business plan and requested changes.  Through this process, several versions of the business plan were generated.

105.    After Mr. Murashige's warnings, Mr. Au knew that his business plan was undercapitalized and risky.  Mr. Au chose to proceed with his business plan anyway.

106. Mr. Marinelli knew that the business plan was undercapitalized from the beginning and approved the plan. He was an experienced businessman. Mr. Marinelli received his Bachelor of Science degree from the University of California, Berkeley, in 1990, and his Master in Business Administration degree from Cornell University in 1993. He had extensive business experience:

a. Mr. Marinelli was the President of Lawrence Investments. He managed all personal financial affairs for the seventh wealthiest man in the world, Lawrence Ellison. He oversaw company acquisitions, equity investments, foreign exchange, accounting, cash management, SEC reporting, and real estate transactions. He started with Lawrence Investments in 2004 as a Vice President and then became the President in 2015. As a matter of policy, the President of Lawrence Investments holds the position of president or manager in all of Mr. Ellison's wholly-owned entities. As a result, Mr. Marinelli was an officer or director of approximately forty companies in which Lawrence Investments or one of Mr. Ellison's other entities has investments or property.

b. As the President of Lawrence Investments, Mr. Marinelli reported directly to Mr. Ellison. When he was the Vice President of Lawrence Investments, Mr. Marinelli reported to the President, Philip Simon.

c. Prior to starting at Lawrence Investments in 2004, Mr. Marinelli had eleven years of experience in business and finance as the:

U.S. Bankruptcy Court - Hawaii  #19-90027  Dkt # 1  Filed  08/12/19  Page 42 of 108

(1) Finance Director of EMCON in San Mateo, California, from 1993 to 1996;

(2) Manager of Transaction and Advisory Services at PricewaterhouseCoopers,

L.L.P. in San Francisco, California, from 1996 to 1999; and (3) Group Director of

Corporate Development for Cadence Design Systems, Inc. in San Jose, California

from 1999 to 2004.

    d.  Over the course of his more than two decades of finance and

business experience, Mr. Marinelli developed an expertise in all aspects of mergers

and acquisitions, including negotiation, valuation, structuring, financing, due

diligence, and operations integration.  He also had formal strategic and business

planning expertise.

  107. Mr. Marinelli was aware of Mr. Au's business plan and participated in

its implementation.  He was the manager of Ohana and the President of Lawrence

Investments while the parties negotiated the transaction, and he was also a director

of Island Air.  Mr. Marinelli understood the nature of the undercapitalized and

risky business plan, yet he was fine proceeding with the transaction and staying on

as an Island Air director to implement it.  In a November 16, 2015 email to Mr. Au

during the transaction negotiations, Mr. Marinelli told Mr. Au:

> Many of your conditions effectively amount to "if you change
> everything so the company is guaranteed to make money, then we will
> invest/loan!"; That's not the opportunity in front of the new money
> investors; rather, the opportunity is to purchase control at an extremely
> inexpensive price and TAKE A RISK that the new investor/mgmt.
> group can turn it around.

Mr. Marinelli later told Mr. Ellison on June 20, 2017, that "the majority owner has kept Island Air very thinly capitalized since we turned over control last January."

## D.    Mr. Au Tried to Avoid Owing Fiduciary Duties to Island Air

108.    Mr. Au is an attorney.  He graduated from Columbia Law School in 1989 and has been admitted to the bars of Hawai`i and California.  Mr. Au practiced law at Pettit & Martin, a large San Francisco law firm, before becoming in house general counsel for a San Francisco private equity investment firm until approximately 1999.  Mr. Au formed PacifiCap, a Honolulu-based investment firm, in approximately 2000 with two other individuals who are no longer involved with PacifiCap.  Mr. Au is the principal and in-house general counsel for PacifiCap.

109.    As an attorney, Mr. Au was aware that directors and officers of a corporation owe fiduciary duties to the corporation.  He took steps to try to avoid owing fiduciary duties to Island Air.  He declined to take a director or an officer position while exercising the powers of a director or officer.  The Unanimous Written Consent of the Board of Directors stated,

> Mr. Au . . . shall be an executive of the Corporation but in such capacity shall not be, and shall not be deemed to be, a corporate director or corporate officer of, and shall not have agency authority to act on behalf of, the Corporation.

110.    Mr. Marinelli believed that Mr. Au did not want to be a director or an officer because doing so would increase personal liability.

111.    While he did not want the official director or officer positions or the attendant fiduciary duties, Mr. Au wanted to have a substantial degree of influence over the company.  Mr. Marinelli believed that Mr. Au felt a strong responsibility to make Mr. Tsui's $2 million investment successful, and as a result, he took an active role in Island Air's operations.

112.    Mr. Au knew that despite his efforts to avoid owing fiduciary duties to Island Air, he was the leading member of Island Air's management team.  In an August 31, 2017 email to Island Air's attorney William Piels, Mr. Au stated that he was a member of Island Air's management team.  Mr. Uchiyama viewed Mr. Au as a member of the Island Air management team.

**E.     During the 2017 Financial Crises, the Only Two Options Were to Shut Down or Obtain a Very Large Investment, but the Control Group Did Neither**

   **1.      During the 2017 Financial Crises, The Only Two Options Were to Shut Down or Obtain a Very Large Investment**

113.    Fifteen months after the Island Air purchase transaction closed, the company ran out of cash and readily available credit and entered a six-month period of back-to-back financial crises and a worsening financial condition that ended with the company's shutdown.  Island Air needed to either obtain a significant investment to continue its operations, or else shut down.

   **a)      Island Air Received a $850,000 Loan From Carbonview on May 17, 2017**

114.    The warnings signs were there in the first quarter of 2017.  Up until

then, Island Air was able to absorb its substantial losses based on the new funds made available to it in the 2016 transaction. By early 2017, those funds were running dry, and the company was not seeing the revenue necessary to fund operations.

115. The cash crisis started in May 2017. Mr. Gossert started as Island Air's Vice President of Finance on May 1, 2017, and by May 4, 2017, he had determined that Island Air would be facing a $700,000 deficit the following week. The deficit was a surprise to Mr. Gossert and caused him to have concerns about the viability of the company based on the financial projections.

116. Mr. Gossert and Mr. Uchiyama sought funding from Mr. Marinelli. On May 16, 2017, Mr. Marinelli agreed that Island Air could draw on the Carbonview line of credit in the amount of $850,000. Island Air received $850,000 on May 17, 2017, but its line of credit with Carbonview was now exhausted.

> b) **Island Air Needed $450,000 for Payroll on June 5, 2017, and Directors Contributed Personal Funds**

117. Less than three weeks after Island Air received $850,000 from Carbonview, Island Air needed additional funding to pay its employees' next payroll.

118. In an email to Mr. Ellison on June 2, 2017, Mr. Marinelli reported that Island Air was "experiencing a cash crunch" and had requested a bridge loan of

$500,000 to $1 million. Mr. Marinelli said that he was inclined to say no to Island Air's request for bridge funding and let Mr. Tsui, the "new majority owner," provide the funding or take the company into bankruptcy. Mr. Ellison agreed with Mr. Marinelli's inclination: "Agreed…no additional funding."

119. On June 3, 2017, Mr. Uchiyama emailed Messrs. Au, Marinelli, and Donovan to call an emergency conference call for June 4th to discuss the "current financial status of Island Air."

120. Mr. Au understood how dire Island Air's financial situation was. Prior to the June 4 conference call, Mr. Au emailed the group and referenced the "current cash crisis" and the possibility that "Island Air closes down this week." Following Mr. Ellison's instruction that there would be no additional funding, Mr. Marinelli made it known to the group that Mr. Ellison's entities would not be providing further investment or support.

121. During the conference call on June 4, 2017, the group was able to come up with the necessary $450,000 from the following sources: (1) $50,000 from Mr. Au's personal funds held in PaCap Management Holdings; (2) $50,000 from Mr. Marinelli's personal funds; (3) $50,000 from Mr. Uchiyama's personal funds; and (4) $300,000 from PaCap Solar Investors, LLC, which is managed by

PacifiCap Investment.[5]  The contributors of the $450,000 paid their funds on or
about June 5, 2017.

> **c)** **On June 20, 2017, Island Leasing Loaned Island Air
> $800,000 and Took a Security Interest in the ATR Spare
> Parts, and Mr. Donovan Resigned**

122.   In a June 11, 2017 email to Mr. Marinelli, Mr. Au recognized Island
Air's ongoing cash needs: "I think if we get just $1 million by the next payroll, we
may need another $300K the following week and another $500K in two weeks."
He said that he was "hoping to get enough funding committed through September
so we can focus on the revenue side of things rather than having to find ways to
raise money each week to survive."

123.   Island Air was facing another payroll crisis on June 21, 2017, and
asked Mr. Marinelli if an Ellison entity could purchase Island Air's ATR spare
parts.  In a June 20, 2017 email seeking approval for the transaction from
Mr. Ellison, Mr. Marinelli stated that he was "fairly confident we could liquidate
these parts for at least $600,000 and perhaps as much as $1.2 million" and that he
could consummate a sale within four weeks. Mr. Marinelli further stated:

> [T]he majority owner has kept Island Air very thinly capitalized since
> we turned over control last January. . . . [T]he company will likely need
> around $5 million in capitalization. If we purchase these spare parts, we

_____

[5] The entity providing the $300,000 was subsequently changed to one of
Mr. Au's other companies, Snowbiz.

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 48 of 108

at least buy the airline a few weeks to seek third party funding and/or drive additional business as the summer season goes into full swing. **Given the downside of a bankruptcy filing this week, I reluctantly conclude we should go ahead and purchase the spare parts as requested by the airline, and then I will push for a sale of both the spare parts and ATR aircraft as quickly as possible.**

124.   In deciding whether or not to approve this transaction, Mr. Ellison had control over Island Air's survival.  He gave his approval for Mr. Marinelli to purchase Island Air's ATR spare parts.  Although Island Leasing and Island Air may have described this transaction as a purchase of Island Air's ATR spare parts, the transaction was effectively a loan of $800,000 from Island Leasing to Island Air with the ATR spare parts as collateral.  This transaction, including the issue of whether it was a loan or a sale, is the subject of an adversary proceeding between the Trustee and Island Leasing.

125.   Island Air received $800,000 from one of Mr. Ellison's bank accounts on June 21, 2017.

126.   Also on June 20, 2017, Mr. Marinelli told Mr. Au: "[S]omeone in management should be developing a 'pitch book/presentation' for HIA and possibly others to make a minority investment.  If we can squeeze through the next couple of payrolls, we need to be ready to move quickly on raising equity."  Mr. Marinelli's strategy at this time was to pursue all available avenues to raise financing from outside sources.  Although Mr. Au agreed with him, Mr. Au was

only willing to agree to new financing on terms that were unrealistically favorable to him (Mr. Au).

### d) Island Air Had Another Payroll Crisis on July 7, 2017

127. On June 27, 2017, less than a week after receiving $800,000 from Mr. Ellison from the spare parts transaction, Mr. Au emailed Mr. Marinelli in preparation for the next payroll crisis: "Island Air needs about $1,000,000 in cash by the end of this week to make its next payroll[.]"

128. Mr. Au and Mr. Marinelli had discussed the possibility of Island Leasing prepaying $375,000 of the marketing/maintenance fee that Island Leasing would pay to Island Air upon signing of the agreement for Elix to buy Island Leasing's ATRs. Based on Island Air's financial state, Mr. Marinelli did not believe this was a wise decision for Island Leasing. On June 27, 2017, Mr. Marinelli responded to Mr. Au that "[i]t just doesn't make sense to pre-pay $375,000 on the hope that . . . Island Air will hang around long enough to help sell/deliver the aircraft[.]"

129. On July 4, 2017, Island Air was waiting to finalize arrangements to receive $1,000,000 by July 5, 2017, in order to avoid a cash shortfall in funding its payroll. Mr. Au believed that this money would come from Elix.

130. Ultimately, the deal with Elix did not go through, and Island Air did not receive the $1,000,000 that Mr. Au believed Island Air would receive from

U.S. Bankruptcy Court - Hawaii  #19-90027  Dkt # 1  Filed  08/12/19  Page 50 of 108

Elix or from any other source. As a result of the lack of funding, Mr. Au scheduled a conference call on July 6, 2017, for Mr. Marinelli, Mr. Uchiyama, and Mr. Gossert to talk with Honolulu bankruptcy attorney Ted Pettit. The call with Mr. Pettit took place without Mr. Marinelli.

131. As of July 7, Mr. Marinelli believed that a Chapter 11 bankruptcy filing was imminent if Island Air did not receive the cash it needed in time.

132. In a July 7 email to Mr. Pettit, Mr. Au documented the fallout from having the payroll funds drawn from an account with insufficient funds:

a. While he was in Tokyo, Mr. Au received a "somewhat frantic call" from Mike Sullivan at California Bank & Trust ("CB&T") saying that Island Air's account was overdrawn by more than $840,000. More than $400,000 of that overdraft was covered by funds transferred from one of Island Air's other accounts at CB&T.

b. While CB&T allowed the payroll funds to be drawn with a resulting overdraft, CB&T management did not allow the employment tax payment of approximately $322,000 to go through.

c. After the call from Mr. Sullivan, Thomas Dalton, Elix's Commercial Director, contacted Mr. Au. Elix's board had met and were very concerned about Island Air's problems. Mr. Au told Mr. Dalton that Island Air

needed a deferment on lease payments from both Elix and NAC for the next 60 days.

133. Within two or three days of the $840,000 overdraft on July 7, 2017, Island Air had received enough in cash receipts to clear the overdraft.

### e) Island Air Hit Another Payroll Crisis in Early August 2017

134. On August 1, 2017, Mr. Marinelli told Mr. Ellison that "Island Air is running on fumes. They may not make payroll this week." At this same time, Mr. Au told Mr. Marinelli that he had spoken with Mr. Tsui: "[Mr. Tsui] is aware of the situation, and he really wants to help, but right now, he cannot financially and feels really bad about it." Mr. Marinelli responded, "I'm sure he understands the ramifications of not funding. Ultimately, he (and Pacific Cap) elected to become majority shareholder and will make the decision as to whether to keep the company going."

135. As a result of Island Leasing and Elix reaching a deal on the ATR sale, Island Air received $500,000 on August 4, 2017. Elix, Island Leasing, and Island Air executed a Letter of Intent on August 4, 2017. The parties agreed that Elix would pay a $500,000 down payment to Island Leasing upon execution of the letter of intent, which Island Leasing agreed to make available to Island Air. The purchase price for the ATRs was $5.5 million ($1.1 million per aircraft), with $2 million to be made available to Island Air. The $2 million in funds for Island

Air comprised the $500,000 down payment that Elix paid and Mr. Marinelli agreed Island Air could receive as a maintenance fee, $888,000 on the purchase date as a loan from Carbonview, and $612,000 to be deposited into a controlled account for release to Island Air on set dates upon satisfaction of certain conditions.

136.    On August 17, 2017, Island Air received another cash infusion from AAR in the amount of $400,000 as a result of AAR purchasing Island Air's ATR spare parts, consumables and expendables, and tools for $1.2 million.

**f)      Island Air Received $888,000 on September 15, 2017**

137.    One month later, Island Air had already burned through the $500,000 down payment from Elix and the $400,000 from AAR and was in a dire financial situation with upcoming payments and handling unpaid vendors.  Mr. Gossert was holding off on issuing checks so that he would have sufficient funds to pay $208,000 in federal excise taxes.  Maintenance vendors had already started freezing Island Air's accounts, and the Director of Maintenance was scrambling to get replacement parts on an as needed basis.  Mr. Gossert was in the process of working out payment plans with the larger vendors, such as Bombardier and other maintenance-related vendors.  Mr. Gossert was particularly worried about Bombardier, whose freezing of Island Air's account would be catastrophic and would potentially ground Island Air's Bombardier Q400 aircraft.

138.   In his Rule 2004 exam, Mr. Gossert described Island Air's survival from May 2017 to this point as the company "essentially bleeding money but did not have a catastrophic injury. . . . essentially just bleeding and Band-Aiding each matter as they arose in the hopes of trying to secure a long term financing arrangement."  The company was bleeding cash and accruing more debt over this period.

139.   On September 15, 2017, the Lease Payment Deferral and Amendment Agreement between Island Air and Elix was executed.  That same day, Island Air received $888,000 from Carbonview in connection with the ATR sale.

140.   Less than one week after executing the Deferral Agreement and receiving $888,000, Island Air was already in financial trouble again.  On September 21, 2017, Philippe Poutissou, Elix's Head of Strategy & Development, emailed Mr. Au, Mr. Uchiyama, and Mr. Gossert to express concern about "the liquidity crisis at Island Air and the urgent requirement for a further cash injection."  On the phone call later that day, Mr. Poutissou expected to hear responses and plans to resolve several different critical issues, including: (1) The plan to survive past the end of the week of October 6, with Island Air's cashflow forecast predicting a negative forecast at the end of that week; and (2) The action plan to raise funds, specifically who was running the plan, the entities the team planned to approach, when the team was meeting with investors.

## 2. The Control Group Chose to Keep Operating and Losing Money

141. With Island Air's history of not being profitable and requiring significant and frequent cash infusions, the only reasonable options for Island Air was to obtain a significant investment or to shut down when it still had assets to pay its employees and other creditors. The Control Group did not take either option. Instead, the Control Group continued with the company's downward spiral.

142. Island Air's bankruptcy attorney, Mr. Pettit, believed that Island Air had waited too long to file for bankruptcy. Shortly before filing for Chapter 11 bankruptcy, the management team called Mr. Marinelli. Mr. Pettit was also on the call, and they informed him (Mr. Marinelli) that they intended to file for bankruptcy the next day. In his 2004 exam, Mr. Marinelli stated, "I recall that Ted Pettit in very strong language telling the management team that, if anything, they had waited too long and there were serious concerns about, for instance, whether or not some employment taxes . . . could be paid even if they filed at that point."

## F. Mr. Au Thought That Mr. Tsui's $2 Million Investment Was Protected in Bankruptcy

143. Mr. Au thought that Mr. Tsui's $2 million investment in Island Air as a purported senior secured debt was protected in a Chapter 7 bankruptcy situation. On June 27, 2017, Mr. Au emailed Mr. Marinelli and stated,

Although I have been spending a lot of time trying to help out at Island Air over the past year and a half or more, my primary legal and fiduciary obligations are to PAF and our PacifiCap investors. . . . I have already explained to our PacifiCap investors that while I'm still trying and hoping for the best, in a worst case scenario, PacifiCap's legal and fiduciary duties to them are primarily limited to trying to ensure that the Senior Secured Debt obligations owed to PacifiCap affiliates by Island Air are paid in full, which I am quite confident can be fully covered by funds that would have to be returned by trade and other junior creditors as "preferences" with respect to funds they received from Island Air over at least the past three months, after which PacifiCap and I would be free to "walk away" from Island Air with no further legal obligation or risk of loss, even before Island Air's certificate and other assets are fully liquidated.

144.    Believing that Mr. Tsui's $2 million investment was fully protected, Mr. Au thought he had no financial downside in the worst-case scenario of Island Air's shut down.  Consequently, the Au Group was free to take a high-risk gamble on finding an investor that would allow them to keep their controlling equity position and would not require either subordinating PaCap Aviation's purported senior secured debt or converting the debt to equity.  In other words, Mr. Au believed he had nothing to lose and everything to gain by holding out for an investor that would contribute significant capital and not interfere with his controlling interest.

## G.    Mr. Au Refused to Consider Reasonable Terms for Investment

145.    Island Air never had a chance at investment for two reasons.  First, the Au Group was not willing to offer enough to attract investors.  Second, the

financial projections they developed were so inaccurate that investors did not believe them.

1.    **Mr. Au Was Not Willing to Offer Anything That Would Attract Investors**

    a)    **Mr. Au Proposed Unrealistic Terms of Investment to H.I.S.**

146.    The pitch to H.I.S. is a good example of the Au Group's unrealistic terms.  On July 4, 2017 in Tokyo, Japan (July 3 in Hawai`i), Mr. Taniguchi met with the President and Chief Financial Officer of H.I.S., a travel agency based in Japan.  Mr. Au also went to Tokyo and stood by in case anyone form H.I.S. wanted to meet with him after Mr. Taniguchi's meeting with H.I.S.  Mr. Au and Mr. Taniguchi put together proposed terms to discuss with H.I.S.

147.    The terms proposed to H.I.S. were unrealistic.  Mr. Taniguchi proposed the following alternatives for H.I.S. to consider:

    a.    Equity: The first proposal was for H.I.S. to make a $6,000,000 equity investment for a 10% ownership interest in Island Air;

    b.    Senior Unsecured Debt: The second proposal was for H.I.S. to loan Island Air $6 million.  Island Air could not even cover its own payroll, let alone millions of debt.  Worse yet, this $6 million loan would not even be senior to PaCap Aviation's loan but instead would have a repayment priority equal to that debt.

    c.    Prepaid Tickets: The third proposal was for H.I.S. to purchase

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 57 of 108

$6 million in prepaid tickets, with the hope that Island Air would survive long enough for H.I.S. to redeem those tickets. If Island Air did not survive, this would essentially be a valueless unsecured loan.

148. Three days later, on July 6, 2017, the company did not have sufficient cash for the next day's payroll, so Mr. Au called a conference call for Mr. Uchiyama, Mr. Gossert, and Mr. Marinelli with Island Air's bankruptcy attorney, Mr. Pettit. As of July 7, 2017, Mr. Marinelli believed that bankruptcy was imminent. In other words, while Mr. Au was asking H.I.S. to contribute $6 million for a 10% ownership interest, Island Air was on the brink of bankruptcy.

149. It is no surprise that H.I.S. did not accept any of Mr. Taniguchi's proposals. Mr. Marinelli testified that it was not reasonable to expect H.I.S. to agree to a proposal to pay $6 million for a 10% interest in Island Air.

### b) Mr. Au Was Unwilling to Give Up Primary Control

150. Mr. Au was not willing to give up primary control of Island Air.

151. Mr. Au was unwilling to convert PaCap Aviation's purported senior secured debt to equity and was unwilling to accept a transaction that would dilute the Au Group's holdings and result in loss of control. When Mr. Uchiyama talked with United Airlines and ANA about an investment in Island Air, they wanted the investors, *i.e.*, PaCap Aviation and Carbonview, to convert their debt to equity. Mr. Uchiyama discussed this condition with both Mr. Au and Mr. Marinelli.

Carbonview was the largest debt holder, and Mr. Marinelli said yes. In contrast, Mr. Au did not want to convert his debt to equity, which would have resulted in him losing control. Mr. Au told Mr. Uchiyama that he (Mr. Uchiyama) was "crazy." This was only a matter of days before Island Air's shutdown.

152. On November 1, 2017, Mr. Marinelli sent Mr. Uchiyama and Mr. Au an email that suggested a proposal for an investment by United and ANA and the Au and Ellison shareholder entities converting debt to equity. His proposal dropped the PaCap Entities to a 21% equity interest from 67%. Mr. Au saw Mr. Marinelli's email, but as of November 8, 2017, Mr. Au had still not agreed to convert debt to equity.

153. Mr. Au was also not interested in engaging with private equity firms that specialized in buying distressed companies. These investors would take control of the company and either buy out the existing shareholders or leave them with small minority positions, and typically require conversion of the debt of existing shareholders to small equity positions or similar restructuring. These are precisely the opposite of the terms Mr. Au was looking for. But these firms consider themselves experts in turning around distressed companies and should have been pursued for the good of Island Air. After Island Air filed for Chapter 11, various private equity firms reached out to Island Air. Those private equity firms wanted a controlling share of Island Air, which Mr. Au would not

allow.  Island Air engaged one investor and only got as far as discussing Island Air's financial state and what they felt was required for their restructuring.

154.   Mr. Au never told Mr. Uchiyama how much equity the PaCap Entities were willing to give up as part of an outside investment.  An equity share would have been a key term in a realistic proposal seeking a multi-million dollar investment from potential investors.  But, Mr. Au remained silent on this point.  This meant that Mr. Uchiyama had no real ability to discuss potential investments with third parties, because he did not know what terms he could entertain, let alone offer.

### c) Mr. Au Further Obstructed Efforts to Attract Investors By Refusing to Develop Terms for Possible Investment

155.   Other than the unrealistic terms that were proposed to H.I.S., Mr. Au, acting on behalf of the Au Group, did not develop any terms at all, which made it impossible to have meaningful conversations with potential investors.  Despite telling Mr. Uchiyama that it was his (Mr. Uchiyama's) and Mr. Gossert's responsibility to talk to investors, Mr. Au never equipped Mr. Uchiyama with the basic terms to propose to investors.

156.   In an email to Mr. Uchiyama on August 19, 2017, Mr. Au said,

I plan to reiterate to Phil and Elix on Mon that as of right now, PacifiCap's commitment to raise more financing from investors is ZERO, until various outstanding issues are resolved to our satisfaction, including, agreement among all lessors on the rent and MR deferral terms, the leasing of MSN 4199, and resolution, understanding and

mutual agreement about all other outstanding issues, including the revenue assumptions.

Mr. Au also told Mr. Uchiyama that fundraising was the responsibility of Mr. Uchiyama and Mr. Gossert, who "need to be working on finding other sources of financing in the event that PacifiCap affiliates are unable or unwilling to invest." That same day, Mr. Au told Mr. Taniguchi that he (Mr. Au) will not raise money and potentially get sued if his investors lost their money.

157. Mr. Au did not give his authority (as the representative of the controlling shareholder) on a proposal with which to approach potential investors – and yet Mr. Au instructed Mr. Uchiyama to seek financing from investors.

158. It is noteworthy that Mr. Au also told a NAC representative that because of his fiduciary responsibility, he could not ask his investors to invest in Island Air. Shortly thereafter, NAC terminated the lease agreement and repossessed its two aircraft. A large problem with Mr. Au's approach generally is that the aircraft lessors, *i.e.*, Elix and NAC, expected a realistic approach to securing investors. Mr. Au was asking the lessors make significant concessions and waive various rights in their leases with Island Air but was unwilling to make concessions of his own necessary to have the hopes of raising outside capital. Not surprisingly, after being given the runaround for months by Mr. Au, the lessors lost patience.

### 2. Island Air's Financial Projections Were So Inaccurate That Investors Did Not Believe Them

159. Island Air's financial projections were so inaccurate that investors did not believe them. In part, this was because Mr. Au wanted the financial projections to look better than they were.

160. While the team prepared financial projections in mid-August 2017, Mr. Uchiyama and Mr. Gossert attempted to create a realistic picture of the company's financials. This realistic picture showed poor performance. Mr. Au asked them to make the numbers look better than they were, saying that if they showed those numbers to NAC, Elix, and EDC (another aircraft lessor from which Island Air was considering trying to secure an additional aircraft), the lessors would not move forward with the support that Island Air needed from them.

161. On August 22, 2017, Island Air received a default notice from NAC. Neville Taylor, NAC's Head of Marketing Americas, said that they "weren't able to get comfortable with the very sharp ramp up in revenue that the plan relies upon."

162. John Gebo of United Airlines also commented on the inaccuracy of Island Air's projections. Specifically, Mr. Gebo pointed to Island Air's historic and projected margins, which are an indicator of profitability. In a November 6, 2017 email to Mr. Uchiyama and Mr. Gossert, Mr. Gebo commented that Island Air had margins of -75% in 2015, -40% in 2016, and -30% in 2017, and then

U.S. Bankruptcy Court - Hawaii #19-90027 Dkt # 1 Filed 08/12/19 Page 62 of 108

projected +20% margins by 2021. Such profitability was higher than United, higher than Hawaiian Airlines, and even higher than Copa, one of the world's most profitable airlines. Island Air had not been profitable from 2013 to 2016 and had been in a financial nosedive since May 2017, so its projection of becoming more profitable than the most profitable airlines in four years' time was unrealistic.

### 3. Mr. Au Could Seek Realistic Investments and Lose Control or Take a High-Risk Gamble

163.    In order to save the airline, the Au Group could have created realistic financial projections and approached investors on realistic terms. This approach could have potentially saved the airline but would mean a certain loss for Mr. Au, *i.e.*, assuming a smaller minority shareholder position, losing control, and subordinating his debt or converting it to a minor equity position.

164.    Instead, the Au Group adopted a commercially unreasonable approach seeking investments focused on preserving their interest rather than the airline's interest, which they reasonably knew would fail. But it would have (if successful): (1) allowed the Au Group to stay in control, (2) preserved Mr. Au's potential for significant returns on Mr. Tsui's investment and on his personal one-third ownership in Island Air (with very little money down), and (3) kept Mr. Tsui's $2 million investment as a fully protected purported senior secured debt.

165.    The Au Group chose an option that any reasonable person would know would fail and shut down the airline only at the last possible moment when it

could no longer maintain its operations and could not even pay its employees their last payroll. It is clear that he was willing to go through every last dollar before voluntarily liquidating.

## H. Mr. Marinelli's Resignation and Failure to Appoint a Replacement Director Were Harmful

166. Mr. Marinelli resigned as a director on July 10, 2017. He harmed the company by resigning and leaving Ohana's director seat vacant.

### 1. Mr. Marinelli Resigned Without Any Consideration for Island Air

167. Mr. Marinelli resigned from the board on July 10, 2017, because he contended that he had a conflict of interest and that he did not have much value on the board. He testified that he was a fiduciary for Mr. Ellison. In the event of a likely Island Air bankruptcy, Mr. Marinelli would be expected to represent Mr. Ellison's interests as Island Air's largest debt holder. Mr. Marinelli believed that advocating for Mr. Ellison's interests while also being a director was untenable. Also, Mr. Ellison said that he no longer wanted to provide funding to Island Air, so Mr. Marinelli did not believe that he was able to add much value to Island Air.

168. Mr. Marinelli admitted that when he resigned, he did not think about the company losing his experience with the industry, his experience with the company, or his general business acumen.

169.   Mr. Marinelli also admitted that he did not think about appointing someone very soon after he resigned.  At that time, he did not believe that it was critical for Mr. Ellison's interests to be represented.  He also did not think about Island Air's interests.  Although he admitted that one of the purposes of board members is to bring to a company leadership and expertise, which is particularly needed in times of crisis, he did not think about his resignation leaving Island Air with only one director, Mr. Uchiyama.  He did not search for a candidate, nor did he ask Island Air management for suggestions on a replacement director.

170.   Mr. Marinelli also resigned because he wanted to avoid having fiduciary liabilities to Island Air going forward.  He thought his actions in support of Mr. Ellison's entities might conflict with his Island Air fiduciary duties.  But those actions—specifically, keeping Island Air on life support long enough to sell the ATR aircraft and to obtain a repayment of the loan of $800,000—were put in motion by him *before* he resigned, and his actions after resignation only furthered that same plan.  In short, he maintained enough control to complete most aspects of his scheme before the bankruptcy.

### 2.     Mr. Marinelli Had The Power To Stop Island Air's Downward Spiral

171.   Mr. Marinelli had the power to stop Island Air's downward spiral.  He could have stayed on the board.  He could have worked with Mr. Au to make one of the two reasonable choices that he had available to him: (1) shut down while the

company was still able to pay its employees and had assets for the creditors, or (2) seek out significant investments on realistic terms.

172. Mr. Marinelli also could have used the threat of the Stock Warrant to take back a controlling interest. He could have exercised the option and put Island Air into liquidation much earlier. He could have exercised the option and found an investor on more realistic terms.

173. Even without being on the board or holding the majority of equity, it is clear that Mr. Marinelli had substantial control over Island Air just based on Mr. Ellison's status as a one-third equity holder and significant creditor.

## I. Mr. Marinelli Wanted to Keep Island Air Alive and Out of Bankruptcy Just Long Enough for Island Leasing to Sell Its ATR Aircraft

### 1. Mr. Marinelli Wanted to Sell the ATRs Before Island Air Filed For Bankruptcy

174. In late July 2017, Mr. Marinelli's highest priority was selling Island Leasing's ATRs. Mr. Marinelli started negotiating the sale of Island Leasing's ATRs to Elix in March 2017. On a May 31, 2017 phone call with Mr. Marinelli and others, Tom Dalton of Elix verbally agreed to purchase Island Leasing's five ATRs for $1.4 million per aircraft, or $7 million total.

175. On June 5, 2017, Mr. Marinelli told Mr. Ellison that if Island Air went into bankruptcy and stopped maintaining the ATRs that the value of the ATRs would "drop precipitously." Mr. Marinelli believed that if Island Air stopped

operating and there were no maintenance employees to help with the aircraft, it would be much more difficult and costly to sell the aircraft. Mr. Marinelli testified that if Island Air stopped operating, then Elix would not have purchased the ATRs because Elix's primary interest was in Island Air's Q400 leases. Elix was motivated to purchase the ATRs because the purchase would also give Island Air a significant cash infusion that would enable Island Air to continue operations and make Q400 lease payments to Elix.

176. Mr. Marinelli felt a similar urgency to have Island Air sell the ATR spare parts so that Island Leasing could be repaid the $800,000 that it loaned Island Air on June 21, 2017, under an arrangement that it would be repaid as soon as Island Air sold the spare parts. In a July 12, 2017 email to Mr. Uchiyama, Mr. Marinelli said, "Island Leasing is perfectly fine with $800k or even $750k if that's where we end up. The key is to get those parts sold and off the property so we don't have to worry about it anymore." In a September 28, 2017 email to Mr. Mackenzie, Mr. Marinelli repeated that he "would like to sell these parts asap."

## 2. Mr. Marinelli Still Had Enough Control To Get Things Done

177. Despite resigning, Mr. Marinelli maintained a certain degree of control over Island Air and was able to get things done. He distanced himself from day-to-day operations to create the illusion of lack of control, but when he needed

to get things done, he could easily do so.

178. For example, Mr. Marinelli was able to have Island Air pay Island Leasing $400,000 on October 13, 2017. Mr. Marinelli's had such control over Island Air that Mr. Au and Mr. Gossert did not even question whether to try to keep the $400,000 and use it toward Island Air's needs.

### 3. Mr. Marinelli Believed Island Air Would Not Survive and Had Written Off the Company

179. Mr. Marinelli wrote off Island Air for two reasons: (1) he believed that Island Air's likely bankruptcy created a conflict for him as a representative of Mr. Ellison, Island Air's largest creditor, and (2) with Mr. Ellison no longer interested in providing funding to Island Air, Mr. Marinelli did not believe he had much value to provide Island Air. So Mr. Marinelli resigned as a director and gave up on trying to save Island Air.

180. As of July 7, he thought that bankruptcy was imminent. On July 8, he received from Mr. Gossert financial information projecting continued negative cash flows with growth and revenue providing greater cash influx and a positive cash balance in the long term. Mr. Marinelli testified that the growth numbers appeared to be overly optimistic. At this point, Mr. Marinelli thought that bankruptcy was more likely than not.

181. As early as July 2017, it was clear to Mr. Marinelli that the Island Air team's solicitation of investors was not effective. Mr. Marinelli testified that

Mr. Au was reluctant to approach friends, acquaintances, and the local business community in advance of having a revised and restructured lease agreement with Elix. Elix, on the other hand, was reluctant to enter into a revised and restructured lease agreement with Island Air without knowing that Island Air had secured new equity investments. Mr. Marinelli encouraged Mr. Au to approach potential investors for commitments conditioned on certain things happening.

182. Mr. Marinelli consistently thought that Mr. Au was not doing enough to solicit investors. In an August 1, 2017 email to Mr. Uchiyama, Mr. Marinelli said, "My view is that Jeff/Pacificap/Panda need to push their investor group to raise a couple million dollars, then finalize negotiations with Elix and NAC. Once that is done, the Japanese opportunity and United should be approached." Mr. Marinelli testified that he was disappointed in Mr. Au's unwillingness to approach the local investment community to seek additional capital in the summer of 2017.

183. Mr. Marinelli testified that as time went on, Island Air's situation looked bleaker and bleaker because new investors were not coming forward and opportunities that had been mentioned weeks and months prior were not bearing fruit. In September and October, Mr. Marinelli noted a "gradual diminishing of the likelihood of avoiding bankruptcy." By the time Island Air filed for Chapter 11 bankruptcy, Mr. Marinelli was not surprised. Even after Island Air filed for

Chapter 11 bankruptcy, Mr. Marinelli lacked confidence that it would emerge from Chapter 11 successfully. In an email to Mr. Ellison on October 16, 2017, Mr. Marinelli noted, "It appears they will continue operations for the time being, while looking for new equity partners."

184. Mr. Marinelli believed that Island Air was unlikely to survive, and so he did not do everything he could to help it:

a. Mr. Marinelli considered aggressively taking over the process by putting together a pitch book and approaching investors himself. He knew how critical it was for Island Air to solicit and secure investments, but he chose not to use his considerable business experience and connections to handle the solicitation of investors.

b. Mr. Marinelli did not try to find someone as a replacement director. Instead, when Mr. Au suggested Mr. Gossert as Ohana's director two months after Mr. Marinelli's resignation, Mr. Marinelli said it was "fine." Mr. Gossert had no experience in the airline industry, had no business experience, and even had very limited experience in finance prior to Island Air. But, to Mr. Marinelli, electing Mr. Gossert was fine.

### 4. Mr. Ellison's and Mr. Marinelli's Funding to Island Air Was Self-Interested and Focused on Selling Island Leasing's ATRs

185. On June 3, 2017, Mr. Ellison told Mr. Marinelli that there would be no additional funding to Island Air, and Mr. Marinelli made this position known to

U.S. Bankruptcy Court - Hawaii  #19-90027  Dkt # 1  Filed  08/12/19  Page 70 of 108

the Island Air team on numerous occasions. But, Mr. Ellison and Mr. Marinelli relaxed their position when it furthered their goal of keeping Island Air alive long enough to sell the ATRs, and only when such funding came at no additional risk. Mr. Ellison approved purchasing the spare parts for $800,000 when Mr. Marinelli said he thought he could sell them for $600,000 to $1.2 million within three to four weeks. Mr. Ellison approved loaning money to Island Air from the ATR sale, but only if Island Leasing received $3.5 million, the amount that Mr. Marinelli said that he could get for the ATRs anyway if Island Air were in bankruptcy, and because that would facilitate getting the funds more quickly and easily.

186. The ATR spare parts transaction was linked to the ATR sale. In his June 20 email to Mr. Ellison recommending the purchase of the spare parts in light of the possibility of a bankruptcy filing, he said he would "push for a sale of both the spare parts and ATR aircraft as quickly as possible."

187. Upon information and belief, on July 28, 2017, Elix offered to purchase Island Leasing's ATR aircraft if Island Leasing agreed to lend most of those funds to Island Air. In an August 1 email to Mr. Au, Mr. Marinelli described Elix's offer as a "non-starter." Mr. Marinelli wanted to get as much cash out of the sale as possible for Island Leasing. Mr. Marinelli viewed Island Air's bankruptcy as a real possibility, and thus any money that was loaned to Island Air from the ATR sale proceeds would potentially be lost to Mr. Ellison's entities.

Mr. Marinelli and Elix then engaged in negotiations whereby Mr. Marinelli was trying to secure as much from the sale of the aircraft as possible for Island Leasing, and Elix was trying to get Island Leasing to lend as much of those funds as possible to Island Air. All the while, Island Air was in a death spiral, losing money for creditors and racking up more debt, while Mr. Marinelli was interested in keeping it alive only so long as to close the Elix deal on the aircraft.

188. Negotiations with Elix continued, and Elix made a new offer. On August 1, 2017, Mr. Marinelli emailed Mr. Ellison:

> As discussed the other day, Island Air is running on fumes. They may not make payroll this week. As an emergency cash source, the lessor of their new Q400s has just proposed the following deal to purchase our ATR aircraft and get cash into the airline:
>
> Purchase price $5 million for all 5 ATR aircraft
> We loan $2.5 of the $5 million to island air, and we take $2.5 million off the table.
>
> I believe that even in a bankruptcy situation, we will recover $3.5 million for those aircraft. Thus, if we assume Island Air will fail regardless, we should reject the deal (of course, our emergency loan would raise the chances of the airline turning around and we could recoup our new loan and even some of our older loans).
>
> If they are willing to up the amount we take off the table to $3.75 million, then I would recommend accepting the offer regardless of potential Island Air success.

With Island Air "running on fumes" and possibly not making payroll the following week, Mr. Marinelli still wanted to nickel and dime Elix in negotiations. Mr. Marinelli recommended that Island Leasing demand $3.75 million ($250,000 above what he believed he could recover if Island Air went into bankruptcy) or

allow Island Air to go into bankruptcy. Elix wanted Island Leading to loan as much of the proceeds of the sale to Island Air as possible, because it was desperately trying to help Island Air avoid bankruptcy so that it would not incur substantial losses on the Q400 aircraft leases with Island Air. Mr. Marinelli knew that Elix had an even greater incentive than Island Leasing did to keep Island Air out of bankruptcy, and he used this as leverage in negotiations. In other words, Elix could either meet his terms, or Mr. Marinelli would allow Island Air to go into bankruptcy and Elix would suffer substantial losses on the Q400 leases. Thus on August 1, 2017, Mr. Marinelli was essentially negotiating with Elix for an extra $250,000 for Mr. Ellison, with Island Air as his hostage with a gun pointed to its head.

189.   Faced with a decision that could mean Island Air's shutdown or its survival, Mr. Ellison responded, "We take $3.5million and give Island Air $1.5 million . . . or no deal." Ultimately, after further negotiation, the parties agreed on a purchase price of $5.5 million, with Island Leasing taking $3.5 million and $2 million going to Island Air. Mr. Marinelli was not bluffing when he was negotiating with Island Air as his hostage. With Mr. Ellison's specific instruction that Island Leasing take $3.5 million, Mr. Marinelli would have walked away from any deal where Island Leasing did not receive $3.5 million, knowing that doing so would shut down the airline.

U.S. Bankruptcy Court - Hawaii  #19-90027   Dkt # 1   Filed  08/12/19   Page 73 of 108

190. Accordingly, Mr. Ellison and Mr. Marinelli would only allow Island Air to receive the amount above Island Leasing's $3.5 million from the Elix deal. In other words, if Elix was only willing to pay Island Leasing $3.5 million for the ATRs, then Island Air would receive nothing, because there would be no proceeds above $3.5 million to loan Island Air. The amount that Island Air received was determined entirely by (1) the amount that Island Leasing could recover in bankruptcy from the planes, *i.e.*, $3.5 million, and (2) the amount that Elix was willing to pay, not by Mr. Ellison's or Mr. Marinelli's generosity toward Island Air. If Elix was unwilling to agree to a deal where Island Leasing would receive $3.5 million, then Mr. Ellison and Mr. Marinelli would have allowed Island Air to go into bankruptcy, as shown by Mr. Ellison's email: "We take $3.5 million and give Island Air $1.5 million . . . ***or no deal***" (emphasis added).

191. Mr. Marinelli did not analyze whether the amount that Island Air would receive was enough to cover its cash flow shortfalls. Funding Island Air from the proceeds of the ATR sale was not something Mr. Marinelli cared about. In fact, he was averse to doing so. Mr. Marinelli testified that Mr. Ellison funded the airline the first time to purchase the aircraft in 2013, Mr. Ellison funded the airline again by doing a sale-leaseback (where Island Leasing purchased the aircraft from Island Air and then leased the aircraft back to them) in 2015, and then with the sale to Elix, Mr. Ellison was asked to take the value of the aircraft yet

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 74 of 108

again and put it back into the airline.  Mr. Marinelli wanted to avoid putting the

ATR sale proceeds back into Island Air and only agreed to do so to close the deal

with Elix.

192.   After Mr. Marinelli closed the deal on the ATR sale with Elix on

September 15, 2017, any funding to Island Air stopped.  He believed that Island

Air would file for bankruptcy and shifted his focus to getting $800,000 from Island

Air in repayment of the June 20 loan.  In an email to Porter Mackenzie on

September 28, 2017, Mr. Marinelli said, "Island Leasing has really worked hard to

help keep Island Air alive and would like to sell these parts asap."  Mr. Marinelli

was in almost daily contact with Mr. Mackenzie regarding getting payment from

the spare parts sale, from that point through October 16, 2017, the day Island Air

filed for Chapter 11 bankruptcy.  At a time when Island Air was most in need of

cash, Mr. Marinelli was trying to take cash out of Island Air and was consuming

the time of its Director of Maintenance doing so.  Island Air wired $400,000 to

Island Leasing on October 13, 2017.  On October 16, 2017, Amy Gee (a certified

public accountant with Lawrence Investments) emailed the Island Air management

team to "[p]lease advise when 2nd $400k is forthcoming."

193.   On October 17, 2017, the day after Island Air's Chapter 11 filing,

Mr. Marinelli reaffirmed to Gordon Bilbey of AAR his intention to complete the

transaction regarding the spare parts: "We absolutely have every intention of

completing the transaction as agreed and on the timeframe you, Porter, and the team have been working." On November 10, 2017, Island Air's last day of operations, Mr. Marinelli was still waiting for the second $400,000 payment. In an email to AAR and Mr. Mackenzie, Mr. Marinelli wrote, "All, Please advise whether all parts were in fact sent and received. Also, has the second $800k [sic] payment been made to Island Air?"

194. The attitude and strategy of Mr. Ellison and Mr. Marinelli is perfectly summed up in a private, internal communication between them right after Island Air filed for bankruptcy. Mr. Marinelli told Mr. Ellison that Island Air filed for Chapter 11 bankruptcy and proudly said, "I'm pleased we were able to sell all of our ATR aircraft last month before the control owner decided to enter bankruptcy." Mr. Ellison responded simply: "Thanks for the heads up."

195. Mr. Marinelli's actions during the financial crisis in furtherance of Mr. Ellison's interests had the worst possible effect on Island Air. He could have used his substantial control to secure a realistic investor in Island Air and effectively overrule Mr. Au. He could have allowed Island Air to go into bankruptcy earlier. Rather, he kept it on life support to achieve his own goals, all the while Island Air was racking up more debt and its assets were dwindling. With his goals finally accomplished, Mr. Marinelli threw the company to the wolves.

**J.    Mr. Au Misled Employees About Island Air's Survival and Then Shut Down Without Paying Final Payroll or Giving Notice Required Under the Law**

196.    When Island Air filed for Chapter 11 bankruptcy, it did not have a serious plan for long-term survival.  In the five months preceding the Chapter 11 filing, Island Air had a series of cash and payroll crises and had required cash infusions of almost $4 million during the period of May through September 2017. Also, Island Air lost two aircraft due to default on its lease with NAC, and renegotiated its lease for three aircraft with Elix.  Furthermore, less than one week after renegotiating the lease and receiving $888,000 from the ATR sale, Elix was already concerned about "the liquidity crisis at Island Air and the urgent requirement for a further cash injection."  When Island Air received Elix's Notice of Termination, it was unable to pay its first rent payment and had requested that Elix release $204,000 from the Controlled Account ahead of the October 31, 2017, scheduled release date.  The Control Group had no choice but to immediately seek funding from outside investors if they hoped to continue operations.

197.    Despite Island Air's dire financial situation the last five months and inability to make its rent payment on its newly negotiated Q400 lease with Elix, Mr. Au wanted to communicate an overly optimistic picture to Island Air's employees that Island Air would survive on a long-term basis.  On October 16, 2017, Mr. Au sent an email to Mr. Pettit and the Island Air directors dictating the

U.S. Bankruptcy Court - Hawaii  #19-90027   Dkt # 1   Filed  08/12/19   Page 77 of 108

tone and content for announcement to the employees. Mr. Au wanted to tell employees that it was business as usual for Island Air: there would be no interruption to service, and all reservations and tickets would be honored. Mr. Au mentioned other airlines around the world and in Hawai`i that had successful Chapter 11 filings, suggesting that Island Air would also emerge from Chapter 11 successfully. Mr. Au never mentioned anything about the company's perilous financial condition. Additionally, Mr. Au suggested that management say that "Island Air is in active discussions with prospective investors who have expressed strong interest in investing in our airline," which both downplayed how critical the need for investments was and also misled the employees about the prospects for securing such investments given Mr. Au's unreasonable expectations about terms he could demand for such investments.

198. Ms. Lagareta revised the announcement to employees but included many of Mr. Au's suggestions and maintained the "business as usual" tone that Mr. Au wanted. On October 16, 2017, Mr. Uchiyama distributed Ms. Lagareta's version of the employee announcement.

199. Twenty-three days later, on Wednesday, November 8, 2017, Mr. Au, Mr. Uchiyama, and Mr. Gossert made the decision to shut down. On November 9, 2017, Mr. Uchiyama told the employees that the next day would be the company's last day of operations.

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 78 of 108

200. The Control Group did not give the employees the 60 days' notice of closure that is required under the WARN Statutes. Mr. Au, in particular, as an attorney, knew or should have known that there would be labor and employment laws implicated by a shutdown of a company the size of Island Air. Given Island Air's need for cash and the inability to secure outside investments, Island Air's closure was inevitable. Yet, Mr. Au did nothing to learn what the law required of a company that was shutting down. Although he readily communicated with Richard Rand about employment issues and with Holland & Knight about the aircraft leases, he did not consult with Mr. Rand to educate himself about the laws protecting employees when a company shuts down. His communications with Mr. Rand about employees focused more on how to fire them for challenging him.

201. Mr. Marinelli, on the other hand, was generally knowledgeable about the notification requirements of the federal WARN Act. He knew that giving notice to employees in advance of a closure was required. Although he believed that Island Air's bankruptcy was imminent as far back as early July, he did not say anything to anyone about the federal WARN Act's notification requirements. Instead, he focused on keeping Island Air alive long enough to sell Island Leasing's ATR aircraft on September 15, 2017. Then he had no further interest in Island Air other than securing repayment of the $800,000 spare parts loan and left Mr. Au to deal with Island Air's worsening financial crisis.

202.  On Friday, November 10, 2017, the company completed its last day of operations.  Island Air did not pay its employees their final wages for the pay period November 1 to November 10, 2017, or their benefits, or any other forms of compensation that were due and owing to them.  Island Air did not have enough money to cover the employees' full wages from the last pay period through the date of closure.  There was no discussion about using Island Air's cash to pay as much as they could to cover what was owed.  No one suggested having the shareholders contribute money to cover what Island Air could not pay of the payroll.  The amount of wages due for a full pay period ranged anywhere between $600,000 and $1 million depending on other items that were being funded, *e.g.*, 401(k) contributions or pilot advances.  The amount due for wages for a partial pay period would have been less than this amount.  Surely Mr. Ellison and Mr. Au's investors could have come up with enough money between them to pay those wages.

203.  Island Air had approximately $127,000 cash in its operating and payroll accounts on November 14, 2017, the date that it converted from Chapter 11 to Chapter 7 bankruptcy.  That money could have gone to the employees as a partial payment of the total compensation owed to them.  Instead, that cash became part of the bankruptcy estate and thus would be paid to Island Air's other creditors,

with senior secured creditors PaCap Aviation and Carbonview first in line to collect that money.

204. After running the company into the ground and then refusing to pay the employees even a partial payment of their owed compensation, Mr. Au told employees on the last day of operations not to worry because the company would be back up and running.

## K. Island Air Violated the Dislocated Workers Act and the WARN Act

205. Both the Dislocated Workers Act and the WARN Act require that the employees receive 60 days' notice before a company closure. No such notice was given here. Where an employer has failed to provide an employee with written notification 60 days prior to the closure, the employer is liable under the Dislocated Workers Act for each affected employee for an amount equal to back pay and benefits for the period of violation. HAW. REV. STAT. § 394B-9(b). The WARN Act has a similar provision imposing liability on an employer for employees' back pay during the violation period. 29 U.S.C. § 2104(a).

206. Additionally, the employees were not paid their wages, benefits, and other forms of compensation. Under the Dislocated Workers Act, an employer who fails to pay the employees' wages, benefits, and other forms of compensation on the effective date of closing is liable to each affected employee in an amount equal to the value of all their wages, benefits, and other compensation for the three

months preceding the closure. HAW. REV. STAT. §§ 394B-11, 394B-12.

207.   As a result of the violations of the WARN Statutes, the Unions filed Proofs of Claims against Island Air in the bankruptcy. On February 26, 2018, ALPA filed a Proof of Claim for no less than $2,899,717.91 in WARN Statutes violations. On February 27, 2018, the Teamsters filed a Proof of Claim for $6,333,978.00 for WARN Statutes violations.  Additionally, on February 27, 2018, the Transport Workers Union, AFL-CIO ("TWU"), filed a Proof of Claim for $26,576.00 attributed to WARN Statutes violations.  The Unions and TWU claimed nearly $10 million in damages as a result of WARN Statutes violations.

## UNIONS' CLAIMS

## COUNT I
### (Violation of Dislocated Workers Act, HRS § 394B-11 and Piercing the Corporate Veil – Failure to Make Prompt Payment of Wages and Benefits)
### (Against All Defendants (Excluding Carbonview))

208.   Paragraphs 1-47, 60-71, 93-102, 108-112, and 196-207 are incorporated and restated herein.

209.   Ohana, PaCap Aviation, and Malama owned or had a controlling interest in Island Air.  These entities directly owned the Debtor and are employers under HRS section 394B-2.  Lawrence Investments, the Ellison Trust, Mr. Ellison, the Tsui Trust, Mr. Tsui, PaCap Management Holdings, and Snowbiz indirectly owned or had a controlling interest in Island Air and are employers under HRS section 394B-2.

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 82 of 108

210.    PacifiCap Investment, PaCap Management Solutions, PaCap

Advisors, Mr. Au, and Mr. Marinelli operated or had a controlling interest in Island

Air and are employers under HRS section 394B-2.  For the managing entities, the

ultimate manager was Mr. Au.  PaCap Aviation's manager was PacifiCap

Investment, whose manager was Mr. Au.  Malama's manager was PaCap

Management Solutions, whose managers were Mr. Au and PaCap Advisors, whose

manager was Mr. Au.  At all times, Mr. Au acted in his capacity as the managers

for PacifiCap Investment, PaCap Management Solutions, and PaCap Advisors.

211.    Ms. Yannone and Mr. Gossert were Island Air directors for

approximately two months prior to shut down and operated Island Air.

212.    Island Air is a commercial or other business entity that employed

100 or more people on the date of closing and during the twelve-month period

preceding the shutdown and is a "covered establishment" within the meaning of

the Dislocated Workers Act.

213.    Island Air closed on November 10, 2017, due to its bankruptcy.

Alternatively, Island Air closed due to another close of business transaction.

214.    Defendants failed to pay each Island Air employee all wages, benefits,

and other forms of compensation due and owing to said employee on the effective

date of closing, November 10, 2017.  To date, Defendants have failed to pay each

employee all wage, benefits, and other forms of compensation due and owing.

215.   As a result, Defendants are liable to the employees affected in an amount equal to the value of all their wages, benefits, and other compensation for the three months preceding Island Air's closure on November 10, 2017, under the Dislocated Workers Act, HRS section 394B-12.

216.   The Court should pierce the corporate veil between PaCap Aviation and its members the Tsui Trust and PaCap Management Holdings.  The Tsui Trust owned approximately 99.8% of PaCap Aviation.  PaCap Aviation was created for Mr. Au and Mr. Tsui to purchase a controlling interest in Island Air and to loan money to Island Air at the time of the transaction.  The Tsui Trust and PaCap Management Holdings financed PaCap Aviation by providing it with funds that were used to loan $2 million to Island Air and to purchase shares for $4,000. PaCap Aviation did not have any employees, and did not have sufficient capital for the business operations for which it was engaged.  An entity called Pacificap Management, Inc. employed a controller who provided administrative assistance to PaCap Aviation and, upon information and belief, all PacifiCap entities; Mr. Au is a director and the only person holding officer positions for Pacificap Management, Inc., which has the same address as the other PacifiCap entities.  PaCap Management Holdings similarly did not have any employees.  PaCap Aviation, PaCap Management Holdings, and Pacificap Management, Inc. all have the same address at the PacifiCap office.  PaCap Aviation was created specifically to shield

10113004-1 / 112969517\V-5

U.S. Bankruptcy Court - Hawaii  #19-90027   Dkt # 1   Filed  08/12/19   Page 84 of 108

its owners from liability in a situation where they specifically anticipated or should have anticipated substantial liability given the manner in which PaCap Aviation's owners managed Island Air. PaCap Aviation represents a classic misuse of the corporate form.

217. The Court should pierce the corporate veil between Malama and its members Snowbiz and PaCap Management Holdings. Malama, Snowbiz, and PaCap Management Holdings all share the same address at the PacifiCap office. Mr. Au is the ultimate sole manager of all three entities. Upon information and belief, Malama does not have any employees and utilizes the controller employed by Pacificap Management, Inc. Malama was created in order for Island Air management to receive equity as incentive compensation, and to hold that equity in a manner that would purportedly shield Malama's owners from liability in a situation where they specifically anticipated or should have anticipated substantial liability given the manner in which Malama's owners managed Island Air. Malama took a one-third interest in Island Air, only contributed the $4,000 equity investment, and upon information and belief, did not have sufficient capital for the business operations for which it was engaged. Malama represents a classic misuse of the corporate form.

218. The Court should pierce the corporate veil between Ohana and its beneficial owner Lawrence Investments. Ohana was formed for the specific

purpose of acquiring the stock of Island Air and does not have any other business other than owning Island Air. Ohana does not have any employees. Ohana's mailing address is the same as Lawrence Investments, LLC. Ohana owned a one-third interest in Island Air, only contributed the $4,000 equity investment, and upon information and belief, did not have sufficient capital for the business operations for which it was engaged. Ohana represents a classic misuse of the corporate form.

219. Mr. Tsui is liable for any liability of the Tsui Trust because the Tsui Trust is a revocable trust and Mr. Tsui, as the settlor, trustee, and beneficiary, has complete dominion over the Tsui Trust, which should be treated as the alter ego of Mr. Tsui.

## COUNT II
### (Violation of Dislocated Workers Act, HRS § 394B-9 and Piercing the Corporate Veil – Failure to Provide Notification)
### (Against All Defendants (Excluding Carbonview))

220. Paragraphs 1-47, 60-71, 93-102, 108-112, and 196-219 are incorporated and restated herein.

221. Defendants failed to provide each Island Air employee with written notification at least 60 days prior to Island Air's closing on November 10, 2017.

222. As a result, Defendants are liable to each affected employee for an amount equal to back pay and benefits for the 60-day period of violation under the Dislocated Workers Act, HRS section 394B-9(b).

223.    For the reasons set forth above, the Court should pierce the corporate veil between: (1) PaCap Aviation and its members Tsui Trust and PaCap Management Holdings, (2) Malama and its members Snowbiz and PaCap Management Holdings, and (3) Ohana and Lawrence Investments.  Further, the Court should treat the Tsui Trust as an alter ego of Mr. Tsui and hold Mr. Tsui liable for the Tsui Trust's liabilities.

## COUNT III
### (Violation of WARN Act, 29 U.S.C. § 2102, and Piercing the Corporate Veil – Failure to Provide Notification)
### (Against PaCap Aviation, Malama, and Ohana)

224.    Paragraphs 1-47, 60-71, 93-102, 108-112, and 196-223 are incorporated and restated herein.

225.    The Control Group failed to provide each Island Air employee with written notification at least 60 days prior to Island Air's permanent shutdown on November 10, 2017.

226.    As a result, the Debtor became liable to each affected employee for back pay and benefits under an employee benefit plan described in 29 U.S.C. § 1002(3), for the 60-day period of violation under the WARN Act, 29 U.S.C. § 2104(a)(1).

227.    The Court should pierce the corporate veil between the Debtor and its shareholders.  Mr. Au had principal control over the Debtor and was also the ultimate manager of both PaCap Aviation and Malama.  Mr. Marinelli was part of

the Control Group and was also Ohana's manager.

## TRUSTEE'S CLAIMS

### COUNT IV
**(Breach of Fiduciary Duty of Loyalty and Piercing the Corporate Veil –**
**Causing Island Air to Violate the Dislocated Workers Act**
**by Failing to Make Prompt Payment of Wages and Benefits)**
**(Against Au Group and Defendants Yannone and Gossert)**

228.   The foregoing paragraphs are incorporated and restated herein.

229.   Mr. Au exercised extraordinary control over Island Air.  Given his control, Mr. Au owed Island Air a fiduciary duty of loyalty.  Mr. Au was also the ultimate manager of both PaCap Entities.  As the controlling shareholders and as shareholders in a close corporation, the PaCap Entities owed Island Air a fiduciary duty of loyalty.

230.   Mr. Au and the PaCap Entities breached their fiduciary duty of loyalty in two ways: (1) by failing to act in the face of a known duty, and (2) by acting in self-interest.

231.   At all times, Mr. Au exercised extraordinary control over Island Air and was the ultimate manager of both PaCap Entities.  Additionally, at all times, Mr. Au acted in his capacity as the manager of PaCap Aviation's manager PacifiCap Investment, of Malama's manager PaCap Management Solutions, and of PaCap Management Solutions' second manager PaCap Advisor.

232.    First, Mr. Au knew that Island Air was required to pay the employees their wages.  He had gone through a six-month period of monthly payroll crises. Mr. Au knew or should have known that Island Air was required to pay the employees their benefits or other compensation owed to them upon Island Air's closure under the Dislocated Workers Act.

233.    Mr. Au had a duty to pay the employees what they were owed upon closing.  Rather than plan for the required payments to the employees, Mr. Au continued operations for reasons of his own self-interest until Island Air ran out of money to continue operations and did not have enough money to pay the employees what was owed to them.  Mr. Au failed to have Island Air pay the employees in the face of a known duty to do so.  In so failing, Mr. Au and the PaCap Entities breached their fiduciary duty of loyalty to Island Air, because failing to pay the employees exposed Island Air to substantial liability.

234.    Second, in failing to plan for the required payments to the employees, Mr. Au acted in his self-interest and in the interests of the PaCap Entities and Mr. Tsui.  Mr. Au believed that Mr. Tsui's $2 million investment was protected in the event of a Chapter 7 bankruptcy, and thus there was no downside to continuing operations.  Rather than plan ahead for a shut down that complied with relevant law when the company still had assets to pay its employees what they were owed, Mr. Au continued operations in the hope that Island Air would somehow be saved

and he could retain control of Island Air.  Mr. Au was hoping for a big win for himself, Mr. Tsui, and the PaCap Entities, and thus he did not take steps to prepare to pay employees what they are owed.

235.   The other directors were dominated or controlled by Mr. Au. Mr. Uchiyama would not challenge Mr. Au. He was the company CEO.  He interacted closely with Mr. Au and knew Mr. Au was in control.  Mr. Uchiyama saw his predecessor CEO challenge Mr. Au and get terminated.  When he and Mr. Au had disagreements, Mr. Au continued to do whatever he wanted because he was dominant and in control.  Mr. Uchiyama could not effectively challenge Mr. Au as the company CEO, and he would not do so as a director.  Mr. Uchiyama was the only director from July 10, 2017, until September 14, 2017.  Mr. Gossert and Ms. Lagareta, elected as directors on September 14, 2017, likewise were dominated by Mr. Au.  Like Mr. Uchiyama, Mr. Gossert was an executive of Island Air and knew that Mr. Au was in control of Island Air.  He would not challenge Mr. Au.  Ms. Lagareta believed that her role as a director was primarily to provide guidance on public relations issues.  She thought she was supposed to defer to Mr. Au on business issues.  Thus, she would not challenge Mr. Au on business or financial decisions.

236.   Mr. Au's failure to have Island Air pay the employees their wages, benefits, and other compensation on the date of closing caused Island Air to be

U.S. Bankruptcy Court - Hawaii   #19-90027   Dkt # 1   Filed  08/12/19   Page 90 of 108

exposed to Dislocated Workers Act claims from the Unions and TWU.

237. As directors, Ms. Yannone and Mr. Gossert owed Island Air a fiduciary duty of loyalty. Ms. Yannone and Mr. Gossert breached their fiduciary duty of loyalty by failing to act in the face of a known duty. They knew that Island Air was required to pay the employees their wages. They knew or should have known that Island Air was required to pay the employees their benefits or other compensation owed to them upon Island Air's closure under the Dislocated Workers Act. Ms. Yannone and Mr. Gossert's failure to have Island Air pay the employees their wages, benefits, and other compensation on the date of closing caused Island Air to be exposed to Dislocated Workers Act claims from the Unions and TWU.

238. For the reasons set forth above, the Court should pierce the corporate veil between: (1) PaCap Aviation and its members Tsui Trust and PaCap Management Holdings, and (2) Malama and its members Snowbiz and PaCap Management Holdings. Further, the Court should treat the Tsui Trust as an alter ego of Mr. Tsui and hold Mr. Tsui liable for the Tsui Trust's liabilities.

**COUNT V**
**(Breach of Fiduciary Duty of Care and Piercing the Corporate Veil–**
**Causing Island Air to Violate Dislocated Workers Act and WARN Act**
**by Failing to Provide Notification 60 Days Prior to Closure)**
**(Against Au Group and Defendants Yannone and Gossert)**

239. The foregoing paragraphs are incorporated and restated herein.

240. Mr. Au, the PaCap Entities, Ms. Yannone, and Mr. Gossert owed Island Air a fiduciary duty of care.

241. At all times, Mr. Au exercised extraordinary control over Island Air and was the ultimate manager of both PaCap Entities. Additionally, at all times, Mr. Au acted in his capacity as the manager of PaCap Aviation's manager PacifiCap Investment, of Malama's manager PaCap Management Solutions, and of PaCap Management Solutions' second manager PaCap Advisor.

242. Island Air did not provide written notification to its employees 60 days prior to its November 10, 2017 closing, which was a permanent shutdown of all Island Air sites of employment.

243. Mr. Au had knowledge of Island Air's financial circumstances in the six months preceding the closure on November 10, 2017. He knew that Island Air's survival was contingent on a significant outside investment and simultaneously obstructed Island Air's efforts to get the necessary investment by refusing to give up control as part of the investment. In other words, Mr. Au knew that Island Air's closure was imminent.

244. Mr. Au failed to inform himself of the WARN Statutes' requirements to provide written notification to employees 60 days prior to the closing. He conducted no due diligence about what was required when a company shut down even though he had several months to do so during Island Air's worsening

financial state in 2017. Island Air had a labor and employment lawyer, Richard Rand. Mr. Au did not contact him to educate himself on what was required for a lawful closure. Instead, Mr. Au kept Island Air going until it ran out of money.

245. In failing to inform himself of the WARN Statutes requirements for a 60-day written notification, Mr. Au failed to exercise such care as an ordinarily prudent person in a like position would use in similar circumstances. Rather, Mr. Au and the PaCap Entities were grossly negligent and breached their fiduciary duty of care owed to Island Air.

246. The business judgment rule does not apply here. Mr. Au's failure to give the employees 60 days' written notification is a product of inaction, not business judgment. In other words, Mr. Au failed to inform himself and did not exercise any business judgment. Furthermore, Mr. Au did not act in good faith or in the best interests of Island Air. Instead, Mr. Au acted in the best interests of himself, Mr. Tsui, and the PaCap Entities as set forth above.

247. Mr. Au's failure to provide employees with written notification 60 days prior to the closure caused Island Air to be exposed to WARN Statutes claims from the Unions and TWU.

248. As the Vice President of Finance, Mr. Gossert had knowledge of Island Air's financial circumstances starting in May 2017. Ms. Yannone had knowledge of Island Air's financial circumstances through her public relations

company's work with Island Air and through her own involvement with Island Air in advance of becoming a director. Like Mr. Au, Ms. Yannone and Mr. Gossert failed to inform themselves of the WARN Statutes' requirements to provide written notification to employees 60 days prior to closing. Ms. Yannone and Mr. Gossert failed to exercise such care as an ordinarily prudent person in a like position would use in similar circumstances and were grossly negligent and breached their fiduciary duty of care. The business judgment rule does not apply because Ms. Yannone and Mr. Gossert did not inform themselves of the WARN Statutes' requirements and thus did not exercise any business judgment.

249.    For the reasons set forth above, the Court should pierce the corporate veil between: (1) PaCap Aviation and its members Tsui Trust and PaCap Management Holdings, and (2) Malama and its members Snowbiz and PaCap Management Holdings. Further, the Court should treat the Tsui Trust as an alter ego of Mr. Tsui and hold Mr. Tsui liable for the Tsui Trust's liabilities.

## COUNT VI
**(Breach of Fiduciary Duty of Loyalty and Piercing the Corporate Veil –
Allowing Assets to Dissipate in Order to Further Own Interests)**
**(Against Au Group)**

250.    The foregoing paragraphs are incorporated and restated herein.

251.    Mr. Au exercised extraordinary control over Island Air. In doing so, Mr. Au owed Island Air a fiduciary duty of loyalty. The PaCap Entities owed Island Air a fiduciary duty of loyalty. Additionally, at all times, Mr. Au acted in

10113004-1 | 112969517\V-5

his capacity as the manager of PaCap Aviation's manager PacifiCap Investment, of Malama's manager PaCap Management Solutions, and of PaCap Management Solutions' second manager PaCap Advisor.

252.   With Island Air's financial crisis in 2017 and certain failure without a significant outside investment, Mr. Au and the PaCap Entities had two options for Island Air: obtain a significant outside investment so that Island Air would have enough cash to survive, or shut down operations while Island Air still had assets to pay its employees what they were owed and minimize the liability to other creditors.  Mr. Au did not do either of those.  Rather, Mr. Au obstructed outside investments by refusing to give up control, and he continued operations.  Mr. Au continued operations until Island Air ran out of cash.

253.   Mr. Au and the PaCap Entities acted in their own self-interest and in the interest of Mr. Tsui.  Mr. Au had a strong interest in maintaining a controlling interest in Island Air and keeping Island Air alive.  He believed that Mr. Tsui's $2 million investment was protected in the event of a Chapter 7 bankruptcy.  Mr. Au continued operations in the hope that Island Air would somehow be saved.  Mr. Au was hoping for a big win for himself, Mr. Tsui, and the PaCap Entities, and thus he was unwilling to give up control or shut down Island Air.

254.   The other directors were dominated or controlled by Mr. Au as set forth above.

255.  Mr. Au's and the PaCap Entities' continued operations of Island Air and their refusal to give up control in connection with soliciting outside investments were breaches of their fiduciary duty of loyalty to Island Air.

256.  These breaches of fiduciary duty of loyalty caused Island Air to lose cash and assets so that it did not have enough cash to pay its employees what they were owed at shutdown and it increased the liability to creditors.

257.  For the reasons set forth above, the Court should pierce the corporate veil between: (1) PaCap Aviation and its members Tsui Trust and PaCap Management Holdings, and (2) Malama and its members Snowbiz and PaCap Management Holdings.  Further, the Court should treat the Tsui Trust as an alter ego of Mr. Tsui and hold Mr. Tsui liable for the Tsui Trust's liabilities.

### COUNT VII
**(Breach of Fiduciary Duty of Loyalty and Piercing the Corporate Veil–
Allowing Assets to Dissipate in Order to Further Own Interests)**
**(Against Defendants Marinelli, Ohana, and Lawrence Investments)**

258.  The foregoing paragraphs are incorporated and restated herein.

259.  As a director, Mr. Marinelli owed Island Air a fiduciary duty of loyalty.

260.  Mr. Marinelli wanted to keep Island Air alive and out of bankruptcy because he wanted to sell Island Leasing's ATRs.  Island Air had transitioned to the Q400s and was no longer flying the ATR aircraft.  Mr. Marinelli feared that if

Island Air went into bankruptcy and stopped maintaining the ATRs that the value of the ATRs would "drop precipitously."

261.   By May 2017, Mr. Marinelli had started negotiating the sale of Island Leasing's ATR aircraft to Elix.  In order to keep Island Air alive and out of bankruptcy long enough for Island Leasing to sell the ATRs, Mr. Marinelli agreed to the spare parts transaction on June 20, 2017.  Island Leasing loaned Island Air $800,000 and Island Leasing took a security interest in Island Air's ATR spare parts.

262.   As a director, Mr. Marinelli owed Island Air a fiduciary duty of loyalty, but instead, he acted in his own self-interest and in the interests of Island Leasing, Lawrence Investments, and Mr. Ellison when he agreed to the spare parts transaction.  Mr. Marinelli also acted in his own self-interest and in the interests of Island Leasing, Lawrence Investments, and Mr. Ellison when he simultaneously avoided putting Island Air into bankruptcy and forcing management to seek realistic investments, and instead kept Island Air on financial life support that resulted in increased debt and dissipation of assets.

263.   Mr. Marinelli set in motion this disloyal strategy while he was an Island Air director and used his control to further it after his resignation.  His resignation does not terminate his liability.

264. Mr. Marinelli breached his fiduciary duty of loyalty to Island Air by funding Island Air with this strategy, which was done in order to sell the ATRs for Mr. Ellison's benefit despite the harm it caused Island Air.

265. These breaches of fiduciary duty of loyalty caused Island Air to further lose cash and assets and incur additional liabilities.

266. Mr. Marinelli's conduct in violation of his duty of loyalty owed to Island Air was carried out for the benefit of Lawrence Investments and Ohana. At all times, Mr. Marinelli was Lawrence Investments' President with authority to act on its behalf and was Ohana's manager with authority to act on its behalf. He thus acted as an agent of both Lawrence Investments and Ohana. As a result, Lawrence Investments and Ohana are liable for Mr. Marinelli's actions.

267. For the reasons set forth above, the Court should pierce the corporate veil between Ohana and Lawrence Investments.

## COUNT VIII
### (In the Alternative to Count VI:
### Breach of Fiduciary Duty of Good Faith and Piercing the Corporate Veil – Resigning While Corporation In Crisis)
### (Against Defendants Marinelli, Ohana, and Lawrence Investments)

268. The foregoing paragraphs are incorporated and restated herein.

269. As a director, Mr. Marinelli owed Island Air a fiduciary duty of good faith.

270. Mr. Marinelli resigned as an Island Air director on July 10, 2017. At that point, Island Air was in a financial crisis, and Mr. Marinelli believed that a bankruptcy filing was imminent. He could have worked with Mr. Au to either shut down the company while it was still able to pay its employees or to seek out significant investments on realistic terms. Mr. Marinelli also could have used the Stock Warrant to take back a controlling interest in Island Air.

271. Rather than help Island Air during its crisis, however, Mr. Marinelli resigned so that he could represent Mr. Ellison's interests in the likely bankruptcy as Island Air's largest debt holder.

272. Mr. Marinelli intentionally acted with a purpose other than that of advancing the best interests of Island Air.

273. Mr. Marinelli breached his fiduciary duty of good faith when he resigned as an Island director. The immediate consequence of this breach was to leave Island Air's interests without proper care and protection. Island Air fell under the full control of Mr. Au, who was acting in his own self-interest and the interests of the PaCap Entities and Mr. Tsui in running the company until it ran out of cash.

274. Mr. Marinelli's conduct in violation of his fiduciary duty of good faith was carried out for the benefit of Lawrence Investments and Ohana. For the

reasons set forth above, Lawrence Investments and Ohana are liable for the actions of their agent, Mr. Marinelli.

275.   Additionally, for the reasons set forth above, this Court should pierce the corporate veil between Ohana and Lawrence Investments.

## COUNT IX
**(Breach of Fiduciary Duties of Care and Loyalty and Piercing the Corporate Veil – Implementing Undercapitalized Business Plan)**

**(Against Au Group and Defendants Marinelli, Ohana, and Lawrence Investments)**

276.   The foregoing paragraphs are incorporated and restated herein.

277.   In exercising extraordinary control over Island Air, Mr. Au owed Island Air fiduciary duties of care and loyalty.  As a director, Mr. Marinelli owed Island Air fiduciary duties of care and loyalty.  As a shareholder in a close corporation and the holder of a stock warrant that allowed it to take back a controlling interest, Ohana owed fiduciary duties of care and loyalty to Island Air.

278.   At all times, Mr. Au was acting on behalf of PaCap Aviation and Malama, and Mr. Marinelli was acting on behalf of Ohana.  Additionally, at all times, Mr. Au acted in his capacity as the manager of PaCap Aviation's manager PacifiCap Investment, of Malama's manager PaCap Management Solutions, and of PaCap Management Solutions' second manager PaCap Advisor.

279.   Mr. Au and Mr. Marinelli did not adequately inform themselves of reasonably available material facts when making their decision to approve the

business plan with the $7 million in capital that it had received when Mr. Au's group purchased a controlling interest in Island Air. Mr. Murashige told Mr. Au and Mr. Tsui that Island Air did not have enough money for him to run the airline. He also told Mr. Tsui that he believed that Island Air needed approximately $15 million. Rather than heed Mr. Murashige's warning and look further, Mr. Au approved the business plan with $7 million.

280. Mr. Marinelli encouraged Mr. Au to approve an undercapitalized business plan, telling Mr. Au in an email that "the opportunity is to purchase control at an extremely inexpensive price and TAKE A RISK that the new investor/mgmt. group can turn it around."

281. The business judgment rules does not apply because both Mr. Au and Mr. Marinelli acted with self-interest and breached their fiduciary duties of loyalty.

282. Mr. Au purchased a two-thirds controlling interest in the airline while putting up less money than the seller. Mr. Au's group only invested $2 million, while Mr. Ellison's group contributed $5 million in new loans and also offered a $3.5 million line of credit. Mr. Au had a strong interest in having a controlling interest in a local airline at a comparatively low investment.

283. Mr. Marinelli had a strong interest in selling a controlling interest in the airline and did not want to put in much more money for its survival. Ohana had already contributed between $50 and $75 million. As early as June 2, 2017,

Mr. Marinelli and Mr. Ellison had agreed on no additional funding for Island Air to solve its cash crises. But for keeping Island Air alive long enough to sell Island Leasing's ATR aircraft, Mr. Marinelli had little concern for Island Air's survival.

284. This undercapitalized business plan was approved by Mr. Au and Mr. Marinelli as part of the purchase transaction of Island Air.

285. As a result of Mr. Au's and Mr. Marinelli's breaches of their fiduciary duties of care and loyalty, Island Air was undercapitalized from the beginning and started a downward financial spiral just over one year later.

286. The Court should pierce the corporate veil between PaCap Aviation and the Tsui Trust for the reasons set forth above.

287. For the reasons set forth above, the Court should pierce the corporate veil between: (1) PaCap Aviation and its members Tsui Trust and PaCap Management Holdings, (2) Malama and its members Snowbiz and PaCap Management Holdings, and (3) Ohana and Lawrence Investments. Further, the Court should treat the Tsui Trust as an alter ego of Mr. Tsui and hold Mr. Tsui liable for the Tsui Trust's liabilities.

### COUNT X
### (Aiding and Abetting Mr. Au's Breach of Fiduciary Duty – Implementing Undercapitalized Business Plan)
### (Against Defendants Marinelli, Ohana, and Lawrence Investments)

288. The foregoing paragraphs are incorporated and restated herein.

289.  In exercising extraordinary control over Island Air, Mr. Au owed Island Air fiduciary duties of care and loyalty, which he breached in implementing an undercapitalized business plan for Island Air.

290.  Mr. Marinelli knowingly induced or participated in Mr. Au's breach. Mr. Marinelli encouraged Mr. Au to take the opportunity to purchase the airline at an "extremely inexpensive price" and to "TAKE A RISK."  As the seller and a party to the transaction he participated in Mr. Au's breach.

291.  Mr. Marinelli knew that after May 2017 the finances of Island Air were in a downward spiral and that Mr. Au was not realistically approaching securing new investments.  Mr. Marinelli had the power and level of control to force a change of course and either pursue realistic investments or liquidate the company.  Yet he did neither.

292.  As a result, Island Air was undercapitalized from the beginning and started a downward financial spiral just over one year later.

293.  Mr. Marinelli's conduct in aiding and abetting Mr. Au's breach of fiduciary duty was carried out for the benefit of Lawrence Investments and Ohana. For the reasons set forth above, Lawrence Investments and Ohana are liable for the actions of their agent, Mr. Marinelli.

294.  Additionally, for the reasons set forth above, this Court should pierce the corporate veil between Ohana and Lawrence Investments.

## COUNT XI
## (Indemnity)

## (Against All Defendants (Excluding Carbonview))

295.   The foregoing paragraphs are incorporated and restated herein.

296.   Island Air has incurred liability for violation of the WARN Statutes because of the action or inaction of the Defendants.

297.   The Trustee is entitled to indemnification from Defendants.

## COUNT XII
## (Equitable Subordination)

## (Against Defendants PaCap Aviation and Carbonview)

298.   The foregoing paragraphs are incorporated and restated herein.

299.   Mr. Au was an insider in control of Island Air, and he was the ultimate manager of PaCap Aviation.  Mr. Au breached his fiduciary duties owed to Island Air as asserted above.  Mr. Au knowingly undercapitalized Island Air when his entities purchased a two-thirds interest in Island Air in 2016, and he structured the investment as purported secured debt instead of an equity investment.  Mr. Au further believed that PaCap Aviation's investment in bankruptcy was protected.  He obstructed Island Air's chances of securing a substantial investment that was necessary for the company's survival.  He intentionally and simultaneously ran Island Air until it ran out of funds for further operations.  In the process, he caused Island Air's assets to dissipate to the

detriment of both Island Air and other creditors. Equitable subordination of PaCap Aviation's claims under 11 U.S.C. § 510(c) is consistent with bankruptcy law.

300. Ohana was the sole shareholder of Island Air prior to Mr. Au's entities buying a majority interest. He knowingly undercapitalized Island Air in 2016 when he agreed to sell a majority interest in Island Air in a transaction structured as purported secured debt rather than equity investment. After the sale, Mr. Marinelli was an insider who was a director until his resignation but continued to have control over Island Air. He also had the ability to take control of Island Air through the Stock Warrant. He was the manager of Island Air's largest creditor, Carbonview, which is beneficially owned by Lawrence Investments, of which Mr. Marinelli is the President. Mr. Marinelli breached his fiduciary duties owed to Island Air as asserted above. He strategically gave Island Air just enough funding to keep it alive long enough for Island Leasing to sell its ATR aircraft, and then he extracted $400,000 from Island Air a mere three days before Island Air filed for Chapter 11 bankruptcy. Mr. Marinelli's conduct caused injury to the other creditors by causing assets to dissipate while he continued to prolong Island Air's life for his own improper, personal purposes. Equitable subordination of Carbonview's claims under 11 U.S.C. § 510(c) is consistent with bankruptcy law.

## COUNT XIII
## (Recharacterization from Debt to Equity)

## (Against Defendants PaCap Entities, Au Group, Ohana, Carbonview, and Lawrence Investments)

301.    The foregoing paragraphs are incorporated and restated herein.

302.    In or about 2015 and continuing through 2016, Island Air had suffered losses and was grossly undercapitalized.

303.    No disinterested lender would have made loans to Island Air.

304.    The PaCap Entities, Au Group, Ohana, Carbonview, and Lawrence Investments (Ohana, Carbonview, and Lawrence Investments collectively the "Ellison Entities") were aware of Island Air's financial condition and gross undercapitalization.

305.    In or about December 20, 2015, Island Air entered into a Loan Agreement with Pacific Aviation (a PacifiCap entity) and Ohana (an Ellison entity), to raise funds through the issuance and sale of purported notes and the sale of common stock.

306.    The PaCap Entities, Au Group, and Ellison Entities objectively intended by their conduct, including the Loan Agreement, to acquire and retain ownership interest in Island Air, but to do so in a manner that placed their investment ahead of Island Air's creditors.

307.    By furnishing the purported loans, the PaCap Entities, Au Group, and Ellison Entities thereby attempted to place their interests above the claims of

independent creditors, while retaining complete dominion and control over Island Air.

308.  Due to Island Air's financial condition and gross undercapitalization, the expectation of repayment on the loans depended solely on Island Air's success.

309.  The purported loans made to Island Air by the PaCap Entities, Au Group, and Ellison Entities, however, were a substitute for and/or in substance were capital contributions that were necessary for the operation of Island Air's business.

310.  For the foregoing reasons, the purported secured claims of the PaCap Entities, namely PaCap Aviation, and the Ellison Entities, namely Carbonview, should be recharacterized as unsecured equity contributions of the PaCap Entities, Au Group, and Ellison Entities (or their respective affiliates) pursuant to the laws of the State of Hawai`i and/or as a matter of equity.

311.  Further, upon recharacterization of loans to equity or capital contributions, the PaCap Entities', Au Group's, and Ellison Entities' purported secured claims are subject to avoidance under 11 U.S.C. § 548.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants for relief as follows:

A.  General damages;

B.      Special damages;

C.      Statutory damages under the Dislocated Workers Act and the

WARN Act;

D.      Treble damages and/or punitive damages to the extent permitted

by law;

E.      An award of reasonable attorneys' fees and expenses;

F.      Prejudgment interest; and

G.      For such further and other relief as the court may deem just

and equitable.

DATED: Honolulu, Hawai`i, August 12, 2019.


        /s/ Nickolas A. Kacprowski
PAUL ALSTON
NICKOLAS A. KACPROWSKI
WENDY F. HANAKAHI

Attorneys for Plaintiffs
ELIZABETH A. KANE, AIR LINE PILOTS
ASSOCIATION, INTERNATIONAL, and
HAWAII TEAMSTERS AND ALLIED
WORKERS, LOCAL 996